## Chartiers Block Coal Co., Appellant, *v.* Mellon.

## Mansfield Coal and Coke Co., Appellant, *v.* Mellon.

[Marked to be reported.]

*Mines and mining—Access to strata underlying coal.*

The owner of the surface of land who has granted to another person the coal under his land, has a right, apart from any reservation in the deed, to access through the coal to the strata underlying it.

*Regulation of access—Equity—Jurisdiction.*

While the surface owner has the legal right to reach in some way the strata underlying the coal, the regulation of such access involves too many

questions affecting the rights of property, and of injury to the underlying strata, to be settled by a court of equity. It is a legislative rather than a judicial question.

*Nature of estate in coal.*

An estate in coal is determinable upon the removal of the coal, and when all the coal is removed the space it occupied reverts to the grantor by operation of law. The grant of an estate in coal does not carry with it any interest in the strata underlying the coal.

*Injunction—Irreparable injury.*

Where the owner of coal has not sustained any irreparable injury by the sinking of oil or gas wells through the coal by the owner of the surface, a court of equity will not award an injunction to restrain the sinking of wells, especially where the effect of the injunction would be to destroy the estate of the surface owner in the minerals below the coal.

Argued Nov. 11, 1892. Appeals, Nos. 309 and 310, Oct. T., 1891, by plaintiff, from decree of C. P. No. 2, Allegheny Co., Oct. T., 1891, Nos. 24 and 319, refusing preliminary injunctions. Before PAXSON, C. J., STERRETT, GREEN, WILLIAMS, McCOLLUM, MITCHELL and HEYDRICK, JJ.

In the Chartiers Block Coal Co. v. Mellon, the bill averred that plaintiff is a corporation owning all the coal under one hundred and eighty-seven acres of land, conveyed to plaintiff in fee simple by R. L. McCully and wife; that prior to the execution of the deed by R. L. McCully, the absolute title to the land, both surface and mineral, was in Samuel McKown; that said McKown vested the fee simple title to the coal with mining privileges in R. L. McCully, without any reservation to the said McKown, his heirs or assigns, of any right, privilege or easement whatsoever in said coal, and said McCully conveyed said coal and mining privileges to plaintiff without any such reservation; that defendants, claiming to have permission of some sort from McKown, entered upon the surface over the coal aforesaid, and erected a derrick, and, for the purpose of obtaining natural gas or oil, or both, drilled one well through the coal belonging to plaintiff, to the depth of about eighteen hundred feet, and are threatening, and intend to drill other wells on said property for the same purpose, through said coal belonging to plaintiff.

That it is impossible for said wells to be drilled in such a manner as to allow the removal of all the coal in said tract, which is the property of plaintiff, without exposing the mine

to leakage from gas from said wells, and rendering the mining operation, now conducted, and hereafter to be conducted upon said property, so hazardous to plaintiff's property and plaintiff's employees as to very greatly injure and depreciate the value of said coal property, if not wholly to ruin the value of the same ; that it will be impossible to prevent the escape of gas from such wells into such coal mines, if said wells are permitted to be bored, and the presence of such gas in the mine, by reason of the volatile, inflammable and explosive character of such gas, whether natural gas or the gas emanating from oil wells, will occasion explosion and fires, to the great destruction of plaintiff's said property, and the probable death and serious maiming of plaintiff's employees.

Defendants filed an answer denying the right of plaintiff to an injunction. Numerous affidavits were presented, both by plaintiff and defendants. After argument the court entered the following decree in the case of Chartiers Block Coal Co. v. Mellon :

" And now, July 18, 1891, this case having been heretofore, to wit, on the 15th day of July, 1891, heard on bill, answer and ex parte affidavits, the court awarded its writ of injunction against the defendants to restrain them, their employees and agents, from further interfering with said plaintiff in its rights, or to any wells other than the one just completed on the premises described in said bill. It is further ordered that plaintiff give bond in the sum of $5,000, with surety to be approved by the court."

In Mansfield Coal and Coke Co. v. Mellon, the facts were similar and the decree was as follows :

" And now, to wit, October 2, 1891, this cause having come on to be heard on the plaintiff's motion for a preliminary injunction on September 12, 1891, and the parties having been fully heard upon their respective proofs and allegations, and by counsel, it is ordered, adjudged and decreed that a preliminary injunction do issue forthwith, restraining and enjoining the defendant and his agents, servants and employees, until the further order of this court, from drilling any well or wells upon or into that certain tract of land described in the plaintiff's bill, and situate in North Fayette township, Allegheny county, Pa., bounded by lands of William Hall, James Neely, heirs of

Hugh Cowan, deceased, and others, containing eighty-seven acres and twelve perches of coal, which will pass into or through the Pittsburgh vein of coal underlying said tract of land, and the court, upon condition that defendant give his bond hereinafter specified, do refuse the preliminary injunction prayed for against any well or wells on said tract of land which at the date of this decree have been drilled by said defendant through said Pittsburgh vein of coal, and do refuse to enjoin the said defendant from drilling wells on said tract at any place or places where they will not pass through said Pittsburgh vein of coal, but will pass through lower strata of coal belonging to said plaintiff.

" And it is further ordered that the plaintiff file a bond with two sureties to be approved by the court, in the sum of two thousand dollars conditioned to indemnify said defendant according to law for any damages arising by reason of the preliminary injunction hereby granted, and in compliance with the conditions upon which the preliminary injunction is partially refused ; it is further ordered that defendant execute and deliver to the plaintiff his bond in the sum of ten thousand dollars, with two sureties, to be approved by the court, conditioned that in putting down and operating any wells now in process of drilling, or which may hereafter be drilled under this decree said defendant shall protect said coal and property of said plaintiff, and also the plaintiff's employees in and about said coal, from all damages by reason of said wells, and that they will, use the best methods, devices and appliances in the construction and operation of such wells ; and that before said wells are abandoned, he shall securely plug the same above each oil- and gas-bearing sand, and in default of the delivery of such bond within five days, it is ordered that a preliminary injunction issue as to the wells permitted under this decree upon plaintiff filing a further bond, with two sureties to be approved by the court, in the further sum of two thousand dollars."

The court afterwards entered the following modified decree :

" October 3, 1891, after hearing the parties on the above motion, the injunction heretofore granted is to be modified or lifted as to the two wells now commenced, but which have not gone down through the Pittsburgh coal vein, on defendants

giving their bond,—proposed final decree to be drawn to this effect."

*Errors assigned* in each case were decrees, quoting them.

*J. S. Ferguson* and *D. T. Watson*, with them *J. G. MacConnell*, for appellant.—This is a proper case for injunction because it will prevent repeated trespasses and irreparable mischief from escaping gas for which there is no adequate remedy at law : Scheetz's Ap., 35 Pa. 88; Stewart's Ap., 56 Pa. 413 ; Penna. Lead Co.'s Ap., 96 Pa. 124; Bitting's Ap., 105 Pa. 521.

The predecessor in title of defendants in each of these cases conveyed all the coal underlying the surface of the land and gave appellants privileges for its mining and removal, and appellants were actually in possession, mining and removing the coal. These predecessors reserved no right of way through the coal, and appellants have not granted to any one such right, and therefore defendants possess no such right.

The action of the court below was an invasion of the property of appellants contrary to the bill of rights, and for the sole and only reason that it might be highly profitable to the appellees, and possibly might do appellants but little damage.

The decree cannot be justified on the grounds that appellee had the right of way by necessity through the coal and property of appellants, and this because such ways are only over the surface of the land, where from the facts surrounding the case the court implies that the parties agreed to make a grant of it or to reserve a right of way : Washburne on Easements, *32 and *33 ; Goddard on Easements, 266 and 268.

A way of necessity is a way of approach to and egress from a certain tract of land for all purposes or for the purposes for which it was used when the implication of the right of way arises.

There cannot be a way of necessity for a thing granted which is destructive of the grant itself or seriously interferes with it: Washburne on Easements, *32; Pierce v. Sellick, 18 Conn. 322.

A way of necessity is strictissimi juris : McDonald v. Lindell, 3 Rawle, 492; Ogden v. Grove, 38 Pa. 487 ; Wissley v. Hershey, 23 Pa. 333 ; Washburne on Easements, p. 164;

Goddard on Easements, 268, 298; Brigham v. Smith, 4 Gray, 297; 3 Kent's Com. *423; Cooper v. Maupin, 6 Mo. 624; McTarish v. Carroll, 7 Md. 352; Gale and Wheatley on Easements, 71 to 85; Pinnington v. Galland, 20 E. L. & Eq. 561; Callins v. Prentice, 15 Conn. 39: Pierce v. Selleck, 18 Conn. 328; Nichols v. Luce, 24 Pick. 102; Oliver v. Pitman, 98 Mass. 50; Lawton v. Rivers, 13 Am. Dec. 746, and note.

If in any emergency this court should hold that there was a way of necessity through the coal granted to appellants, this way is limited strictly to one way only, and not six or more ways, as convenience might dictate: McDonald v. Lindell, 3 Rawle, 496.

These wells cannot be drilled through the coal and used for the purposes for which they are drilled without imminent danger in the working of the coal, both to persons and property.

Under the last decision in this court it is said that the grant of the coal was the conveyance of the space which the coal occupies, and that the grantee became seized in fee simple both of the coal and space. If this be so, why is not the grantee vested with whatever oil or other mineral or valuables that are below the coal, instead of there being an implication of a reservation of these to the grantor: Lillibridge v. Lackawanna Coal Co., 143 Pa. 293.

*J. McF. Carpenter*, for appellee.—We contend that we have a right of way from necessity; but our right to drill through the coal of another, to obtain and utilize that which we own and which we can obtain in no other way, is not dependent merely upon "right of way" as commonly understood. If the law be as claimed by appellants, then it matters not whether the coal vein be three or twenty feet in thickness; so long as it is owned by a third party, the owner of the farm and those claiming under him are absolutely cut off and shut out from all use of the underlying oil, gas, etc., although it be, as in fact it often is, of many times the value of the coal. It will not do to say that the lessee of the oil and gas rights can buy his way through the coal. Let it be known once that this must be done, and all drilling for oil, gas, etc., in coal fields will cease, because, if appellant's contention is correct, nothing short of a purchase of the coal will suffice. Is this court prepared to say

that oil producing must cease in Western Pennsylvania? The reversal of the decrees in these cases will have that effect.

Aside from the trifling bit of coal necessarily removed in drilling there is no injury shown as having occurred or as likely to occur.

Mining rights are peculiar and exist from necessity, and the necessity must be recognized and the relative rights of land and mine owners adjusted and protected accordingly: Sanderson v. Coal Co., 113 Pa. 139.

OPINION BY MR. CHIEF JUSTICE PAXSON, January 9, 1893:

This is a case of first impressions and of very grave importance. And in view of these facts, we have been asked to express our opinion of the law bearing upon it, notwithstanding it is an appeal from a decree awarding a preliminary injunction. The facts are probably as fully before us now as they will ever be.

The contest arises between the owner of the surface, or his lessees, and the Chartiers Block Coal Company, the plaintiff below and appellant, which is the owner in fee of the coal beneath the surface. The company purchased the coal on December 22, 1881, and the deed conveying it granted not only all the coal, but also the mining rights and privileges, including the right to enter mines and carry away all the coal; the right to make openings or entries, air courses, water courses, drainage and shafts, with right of ingress and egress for the purpose of making such openings, with right of way for taking such coal or any other coal and minerals through the entries, and also the right to enter upon the surface of the land for the purpose of taking into and placing on the same any material that it may desire and need in its coal operations, and when making entries or shafts, the right to deposit the débris and slack near the openings.

The grantor, in conveying the coal with these privileges, reserved to himself no right, privilege or easement in said coal, or any part thereof, and no right of way through said coal from the surface to obtain gas or oil, or any other substance. It is not likely at the time the grant was made that it occurred either to the grantor or the grantee of the coal that underneath the latter there might lie another substance of perhaps greater

value than the subject of the grant itself. It now appears that the coal is underlaid with the oil and gas bearing sand, which can only be reached by sinking wells from the surface through the strata of coal. Shortly before the filing of this bill it began to be known that oil or gas existed in large quantities in that part of Allegheny county where the appellants' works are situated, and active operations had begun in the early summer of 1891 by oil operators to obtain this oil and gas.

About this time the surface owner made leases for oil and gas purposes, and the lessees began at once to drill. This bill was then filed by the appellant company for the purpose of obtaining an injunction against the defendants, to restrain them from further drilling wells then commenced, and from drilling any other well or wells which would pass through the coal. The bill was filed upon the allegation and belief that the defendants had no right whatever to drill the wells. The plaintiff company also claimed that it was impossible for such wells to be drilled in such a manner as to allow the removal of all the coal without exposing the mine to leakage from gas from said wells, and rendering the mine operations so hazardous to plaintiff's property and plaintiff's employees as to very greatly injure and depreciate the value of said coal property, if not wholly to destroy the value thereof.

The case was heard below upon bill, answer and affidavits. The court, as we understand the decree, refused to grant a preliminary injunction as against any well or wells on said tract of land which at the date of the decree had been drilled by the defendant through the Pittsburgh vein of coal, and also refused to enjoin the defendant from drilling wells on said tract at any place or places where they will not pass through said Pittsburgh vein of coal, but will pass through lower strata of coal.

The court awarded an injunction, however, as to any wells not already drilled which would pass through the Pittsburgh vein, and, in addition to the ordinary injunction bond, the decree required that the defendant should execute and deliver to the plaintiff his bond in the sum of ten thousand dollars, with two sureties to be approved by the court, conditioned that in putting down and operating any wells now in process of drilling, or which may hereafter be drilled under this decree, said defendant shall protect said coal and property of said plaintiff,

and also the plaintiff's employees in and about said coal from all damages by reason of said wells, and that they will use the best methods, devices and appliances in the construction and operation of such wells; and that before said wells are abandoned he shall securely plug the same above each oil and gas bearing sand.

Subsequently the decree was modified so as to remove the injunction from the two wells now commenced, but which have not gone down through the Pittsburgh coal vein on defendant's giving bond as before stated.

The learned judge below justified his decision, as we learn from his opinion in another case heard before him and involving substantially the same questions, upon the ground that the owner of the surface has a right of way by necessity through the coal to reach his oil and gas lying beneath it. But he concedes that to make such right available it would require a large modification of the rules in relation to a right of way by necessity over the surface. "Yet," to use his own language, "my present impressions are that it can and should be sustained in a reasonable manner, having due regard for the interest and rights of both parties. But it cannot be permitted to an extent that will destroy the grant of the coal, nor even to seriously depreciate it without ample compensation. The owner of the surface cannot bore where he pleases, nor as often as he pleases. The right of designating the reasonable location of the one right of way by necessity, which the law recognizes, has always been held to be in the owner of the land. If he refuses to designate such way, then the owner of the right of way can designate it, or can apply to the court to have it located."

This is a new question and one that is full of difficulty. The discovery of new sources of wealth, and the springing up of new industries which were never dreamed of half a century ago, sometimes present questions to which it is difficult to apply the law, as it has heretofore existed. It is the crowning merit of the common law, however, that it is not composed of ironclad rules, but may be modified to a reasonable extent to meet new questions as they arise. This may be called the expansive property of the common law. Mining rights are peculiar and exist from necessity, and the necessity must be recognized, and the rights of mine and landowners adjusted

and protected accordingly.   We have an illustration of this in the Pennsylvania Coal Company v. Sanderson, 113 Pa. 126.

The mining of coal and other minerals is constantly developing new questions.   Formerly a man who owned the surface owned it to the centre of the earth.   Now the surface of the land may be separated from the different strata underneath it, and there may be as many different owners as there are strata : Lillibridge v. Coal Company, 143 Pa. 293.   The difficulty is to so apply the law as to give each owner the right of enjoyment of his property or strata without impinging upon the right of other owners, where the owner of the surface has neglected to guard his own rights in the deed by which he granted the lower strata to other owners.

In the earlier days of the common law the attention of buyers and sellers, and, therefore, the attention of the courts, was fixed upon the surface.   He who owned the surface owned all that grew upon it and all that was buried beneath it.   His title extended upward to the clouds and downward to the earth's centre.   The value of his estate lay, however, in the arable qualities of the surface, and, with rare exceptions, the income derived from it was the result of agriculture.   The comparatively recent development of the sciences of geology and mineralogy, and the multiplication of mechanical devices for penetrating the earth's crust have greatly changed the uses and the values of lands.   Tracts that were absolutely valueless, so far as the surface was concerned, have come to be worth many times as much per acre as the best farming lands in the commonwealth, because of the rich deposits of coal, or iron, or oil, or gas known to underlie them at various depths.   These deposits are sometimes found, however, beneath well cultivated farms, so that the surface has a large market value apart from the value of the deposits of coal or other minerals under it.   In such cases the owner is rarely able to utilize the lower stores of wealth to which he has title, by mining operations conducted by himself, and for this reason he sells them to some person or corporation to be mined and to be moved.   So it often happens that the owner of a farm sells the land to one man, the iron, or oil, or gas to another, giving to each purchaser a deed, or conveyance in fee simple for his particular deposit or stratum, while *he* retains the surface for settlement and cultivation precisely as he

held it before.  The severance is complete for all legal and practical purposes.  Each of the separate layers or strata becomes a subject of taxation, of incumbrance, levy, and sale, precisely like the surface.  As against the owner of the surface each of the several purchasers would have the right, without any express words of grant for that purpose, to go upon the surface to open a way by shaft, or drift, or well, to his underlying estate, and to occupy so much of the surface, beyond the limits of his shaft, drift, or well, as might be necessary to operate his estate, and to remove the product thereof.  This is a right to be exercised with due regard to the owner of the surface, and its exercise will be restrained, within proper limits, by a court of equity if this becomes necessary ; but subject to this limitation it is a right growing out of the contract of sale, the position of the stratum sold, and the impossibility of reaching it in any other manner.  So far, our way is clear of difficulty because the several owners of the mineral deposits are exercising their right to have access to their respective estates against their vendor.  Our question is over the right of the vendor to reach strata underlying a stratum which he has conveyed to another.  Having sold the coal underlying the surface, is he to be forever barred from reaching his estate lying beneath the coal?  Prior to the sale of the coal his estate, as before observed, reached from the heavens to the centre of the earth.  With the exception of the coal his estate is still bounded by those limits. It is impossible for him to reach his underlying estate, except by puncturing the earth's surface and going down through the coal which he has sold.  While the owner of the coal may have an estate in fee therein, it is at the same time an estate that is peculiar in its nature.  Much of the confusion of thought upon this subject arises from a misapprehension of the character of this estate.  We must regard it from a business, as well as a legal, standpoint.  The grantee of the coal owns the coal but nothing else, save the right of access to it and the right to take it away.  Practically considered, the grant of the coal is the grant of a right to remove it.  This right is sometimes limited in point of time ; in others it is without limit.  In either event it is the grant of an estate determinable upon the removal of the coal.  It is, moreover, a grant of an estate which owes a servitude of support to the surface.  When the coal is all re-

moved the estate ends for the plain reason that the subject of it has been carried away. The space it occupied reverts to the grantor by operation of law. It needs no reservation in the deed, because it was never granted. The grantee has the right to use and occupy it while engaged in the removal of the coal, for the reason that such use is essential to the enjoyment of the grant. It cannot be seriously contended that after the coal is removed the owner of the surface may not utilize the space it had occupied for his own purposes, either for shafts or wells, to reach the underlying strata. The most that can be claimed is that, pending the removal, his right of access to the lower strata is suspended. The position that the owner of the coal is also the owner of the hole from which it has been removed, and may forever prevent the surface owner from reaching underlying strata, has no authority in reason, nor do I think in law. The right may be suspended during the operation of the removal of the coal to the extent of preventing any wanton interference with the coal mining; and for every necessary interference with it the surface owner must respond in damages. The owner of the coal must so enjoy his own rights as not to interfere with the lawful exercise of the rights of others who may own the estate, either above or below him. The right of the surface owner to reach his estate below the coal exists at all times. The exercise of it may be more difficult at some times than at others, and attended with both trouble and expense.

No one will deny the title of the surface owner to all that lies beneath the strata which he has sold. It is as much a part of his estate as the surface. If he is denied the means of access to it he is literally deprived of an estate which he has never parted with. In such case the public might be debarred the use of the hidden treasures which the great laboratory of nature has provided for man's use in the bowels of the earth. Some of them, at least, are necessary to his comfort. Coal, oil, gas and iron are absolutely essential to our common comfort and prosperity. To place them beyond the reach of the public would be a great public wrong. Abounding, as our state does, with these mineral treasures, so essential to our common prosperity, the question we are considering becomes of a quasi public character. It is not to be treated as a mere contest be-

tween A and B over a little corner of earth. We have already seen that when the owner of the surface parted with the underlying coal he parted with nothing but the coal. He gave no title to any of the strata underlying it, and it is not to be supposed for a moment that the grantor parted with or intended to part with his right of access to it. We are of opinion that he has such right of access. The only question is, how that right shall be exercised, by what authority, and under what limitations.

While there is some analogy between such right and the common law right of way of necessity over the surface, we quite agree with the learned judge below that it would require a large modification of the common law rule. We do not see our way clear to apply the doctrine of a surface right of way of necessity to the facts of this case. While the right of the surface owner, to reach in some way his underlying strata, is conceded, it involves too many questions affecting the rights of property, and of injury to the underlying strata, to be settled by the judiciary. It is a legislative rather than a judicial question. It needs and should promptly receive the interposition of the legislative authority. That body is now in session, and we have no doubt its wisdom will enable it to dispose of this somewhat difficult question in such manner as to protect the rights of the surface owner and yet do no violence to the rights of others to whom he has sold one or more of the underlying strata. With the right conceded, there can be no serious difficulty in the law-making power affording a proper remedy. That remedy should be carefully guarded. The owner of the underlying strata should not be permitted at his mere will and pleasure to interfere with strata lying above him. All this requires an amount of legal machinery that a court of equity cannot supply, however wide its jurisdiction and plastic its process. In all such cases there should be a petition to the court, and a decree regulating the mode of exercise of the right. There should also be a provision for the appointment of a jury of view to assess the damages. In this way the rights of the surface owner can be preserved without any wrong to the owner of the coal.

While we do not fully sustain the reasons given by the learned judge below, we will not interfere with this decree for

another reason.   The plaintiff company has not yet sustained any irreparable injury by reason of the sinking of these wells, and it may never do so.   We find ourselves upon a new road, without chart or compass to guide us, and we propose to move slowly.   The appellants have appealed to us as chancellors, and even if we concede their right to be clear, it does not follow that as chancellors we will enforce it.   The effect of doing so would be to leave the owner of the surface at the absolute mercy of the owner of the coal.   It is true, he can buy the coal of the latter, but only on the terms dictated by the owner.   To grant the injunction as claimed by the appellant would be to destroy the estate of the surface owner in the minerals below the coal.   If this were the only case of the kind in the state we might perhaps modify our views to some extent, but when we reflect upon the fact that many other similar cases exist, and that a vast quantity of the leased coal lands in the western part of the state are underlaid with oil and gas, precisely as in the case in hand, we cannot close our eyes to the fact that vast interests may be affected by our decree, and great injury done to the rights of others.   It is familiar law, too familiar to need the citation of authority, that the decree of a chancellor is of grace, not of right, and that he is not bound to make a decree which will do far more mischief and work far greater injury than the wrong which he is asked to redress.

For these reasons we will not disturb the decree of the court below.   The appellant company has its remedy at law, and to that we will remit it.

The decree is affirmed, and the appeal dismissed at the costs of the appellants.

CONCURRING OPINION BY MR. JUSTICE WILLIAMS, January 10, 1893:

I concur in the decree made in this case, and in the opinion which so ably vindicates it, but I would go further.   I would lay down the broad proposition that the several layers or strata composing the earth's crust, are by virtue of their order and arrangement subject to reciprocal servitudes; and as these are imposed by the laws of nature, and are indispensable to the preservation and enjoyment of the several layers or strata to and from which they are due, the courts should

recognize and enforce them. When the servitude is the result of natural forces affecting the conformation of the surface the courts have taken notice of it and enforced it for and against adjoining owners. Thus, the owner of land crossed by a stream has a right, as against the owner above him, to insist on the delivery of the stream to him within its natural channel; and he is in turn bound to receive it from such upper owner. He is under a like duty to deliver it to the owner below him, and has a like right to insist that such owner shall receive it from him. The true foundation on which the relative rights and duties of these several owners must rest is not found in the order of their respective purchases, nor in the terms of the conveyances under which they take title. It is not found in any statute regulating the flow of streams or the duties of riparian owners. It is found in the character of the surface over which the stream flows, and the operation of the laws of gravity upon the water of the stream.

A purchaser of land is bound to take notice of its situation and is conclusively presumed to have bought with full knowledge of, and in subordination to, the servitude which that situation imposes. But the relation of successive farms along the course of a stream is no more clearly due to the forces of nature than are the order and position of the rocks and minerals which compose the earth's crust. One who buys a single stratum is bound to know where it is, and how it is situated with reference to the strata above and below it; and he must be conclusively presumed to have taken title subject to the servitudes imposed by nature upon it as the necessary consequence of its position among the rocks that underlie the surface. He knows that his stratum lies upon and is supported by the rocks below it, and that other rocks lie upon and are supported by his stratum. He knows that his estate can only be reached by passing through the strata that overlie it; and that the estates below him can only be reached by passing through his. This necessity is not the result of any act of his, or of his vendor, but of the relation the several strata bear to each other as arranged in their order by the forces of nature. They owe to each other the reciprocal obligations of access and support. The lower can only be reached through the upper. The upper can only by supported by the lower.

The courts have long recognized the servitude for support, and in a multitude of cases on both sides of the Atlantic have compelled its observance, and punished its neglect. They have enforced the right to support as one existing independently of, and requiring no aid from, statutes or contracts, and as resting on the order of creative work and the laws of nature. This right may be waived by the owner of the surface : Penn Gas Co. v. Versailles Fuel Gas Co., 131 Pa. 522 ; but if not waived the owner of the lower stratum cannot escape its obligation. But the necessity for access results from the work of nature just as truly as the necessity for support. Both must be had in nature's way or not had at all. Take away the servitude for support and the surface may be made unsafe for either residence or cultivation, and so become valueless. Take away the servitude for access which the natural arrangement of the stratified rocks imposes upon the surface, and the mineral deposits in them are inaccessible and therefore useless. Recognize these reciprocal servitudes and the value of the surface is preserved while the mineral deposits are made accessible and made to minister to the comfort and advancement of the race. They rest on the same foundation. To change the figure, they may be said to be the obverse and the reverse of the same coin. They are due from, and due to, every layer of the earth's crust in succession, from the surface to the centre, because of the relation these layers hold to each other in the order of their creation. We do not hesitate to enforce the servitude for support, whether subjacent or adjacent, or to regulate the extent and manner in which it shall be rendered and enjoyed. With equal propriety, and with equal ease, we may enforce the servitude for access, and regulate the extent and manner in which it shall be rendered and enjoyed. The power of the chancellor would extend to all incidental subjects, and enable him to impose terms as to the manner in which an owner of the lower estate should exercise his right of access, the precautions he should employ, and the compensation he should make for actual injury done.

It is interesting to note how generally business men engaged in developing the mineral resources of the state have recognized this right of access and interposed no obstacle in the way of its exercise. I have before me, as I write, the estimate

of well informed producers and dealers, thoroughly familiar with the several oil fields in the state, and identified with the business from the early developments on Oil Creek thirty years ago to the present time. This estimate fixes the total number of oil wells drilled in Pennsylvania at about sixty thousand, exclusive of wells drilled in localities known to produce only gas. Three fourths of the whole number are within the limits of the carboniferous measures; and one half have penetrated workable veins of coal. During these thirty years of active operations the question of the right of access to the sand rocks in which the oil is found has never before reached this court. This cannot be accounted for except upon the theory of the general concession of the right by all parties concerned in the ownership of the coal and in the operations of mining. The magnitude of the business, and the importance of this question, will be evident when it is remembered that these wells have had an average cost of about four thousand dollars each before oil could be secured from them, and a total cost of two hundred and forty millions of dollars. The actual production of oil has ranged from four thousand barrels per day thirty years ago, to one hundred and ten thousand barrels per day. It is now standing at not far from sixty thousand barrels. The price has fluctuated between fifty cents per barrel and three dollars. A conservative estimate of the total production places it about five hundred and sixty millions of barrels with an average value of not less than one dollar per barrel in its crude state. For twenty years the northern oil field was within and immediately adjoining the judicial district in which I presided, and I never heard of an accident in a coal mine that was charged upon, or that could be traced directly or indirectly to, the wells that penetrated the coal or to the escape of oil or gas from them into the coal, or the mined-out openings from which the coal had been taken. The manner in which wells are cased and tubed renders the possibility of such escape so remote as to reduce the risk of accident to proportions that are practically insignificant. But if the risk was much greater, it could be provided for by requiring additional precautions to be taken, and security to be given for the reimbursement of the owner of the intermediate estate for any loss he might sustain. As it now stands the decree of this court recognizes the exis-

tence of a right of access existing in the nature of things, wholly independent of all statutory enactments, and yet refuses to enforce that right or regulate its exercise. It says to the owner of the lower estate, "You have an undoubted right of access to the layer of the earth's crust in which your wealth lies, but equity will not protect or aid you in its exercise. The owner of the intermediate stratum may sue you and recover damages from you for doing what it is your right to do, and a chancellor cannot hear your complaint or lift his hands to protect you, until the legislature has provided him with ears and hands for that purpose."

I would hold that the jurisdiction is as clear as the right of access. That the parties are in a court competent to deal with the whole subject, and that the decree of the court below should be affirmed for that reason, and at the cost of the appellant.

MR. JUSTICE GREEN and MR. JUSTICE McCOLLUM:
We fully concur in this opinion.