TELFORD et al. v. JENNING PRODUCING CO.

(Circuit Court of Appeals, Seventh Circuit. January 10, 1913. Rehearing Denied March 11, 1913.)

No. 1,853.

MINES AND MINERALS (§ 57*)—OIL AND GAS LEASE—CONTRACT—BREACH.

Plaintiffs contracted with defendant company for consideration of $75 per acre to obtain for it an oil and gas lease on certain described property, to be signed by the owners of the land, leasing to defendant the land for oil and gas, together with good and sufficient title. *Held*, that such provision did not require plaintiffs to convey to defendant an absolute estate in fee to all of the premises, defendant being only entitled to the oil and gas with proper servitudes on the remaining property to efficiently

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

permit extraction and removal, and hence it was no defense to defendant's liability for refusal to accept a lease that the owners of the land had previously conveyed the coal rights under 50 acres of the tract.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 167; Dec. Dig. § 57.*]

In Error to the Circuit Court of the United States for the Eastern District of Illinois; Francis M. Wright, Judge.

Action by James D. Telford and another, doing business as Telford & Schwartz, against the Jennings Producing Company. Judgment for defendant, and plaintiffs bring error. Reversed, with directions.

Plaintiffs in error, hereinafter termed plaintiffs, procured a written option from one Lyford and wife for the purchase by plaintiffs from the defendant in error, hereinafter called defendant, of a tract of 162½ acres of land in Marion county, Ill., for the price of $40 per acre. Shortly after the option was obtained. oil was discovered on neighboring land. Thereupon, and on July 24, 1909, plaintiffs and defendant entered into a written agreement, whereby plaintiffs agreed with defendant, for and in consideration of $75 per acre for the oil and gas lease to said premises, to procure and deliver to defendant a lease in due form, signed by the owner of said land, leasing to defendant the said land for oil and gas, "together with good and sufficient title," etc., in consideration whereof defendant agreed to accept a lease containing the terms, conditions, and stipulations of a certain copy of the proposed lease attached to said agreement, and made a part thereof, and pay said sum of $75 per acre for said land on delivery of said lease.

The lease provided that plaintiffs, in consideration of $1 in hand paid and of the covenants and agreements made by defendant in said lease granted, demised, leased, and let to defendant, "for the sole and only purpose of mining and operating for oil and gas and of laying pipe lines, constructing tanks, buildings," and other necessary structures, the said tract of 162½ acres. The lease was to remain in force 10 years, and as long thereafter as oil or gas was produced therefrom by defendant. In consideration of plaintiffs' said covenants, defendant agreed to complete a well on said premises within four months, and to perform certain other covenants not here in question.

An abstract of title was produced to defendant's counsel, from which it appeared that the coal rights lying under 50 acres of the 162½-acre tract had been deeded away. When advised of this by his attorney, as he was, defendant's agent said defendant was not leasing for coal, but for oil, and did not care a snap of his finger about the sale of the underlying coal. After this the contract above recited was prepared and signed. Thereupon plaintiffs took steps to exercise their option, and procure a deed from the Lyfords. The latter resisted, so that the summer of 1909 was spent in negotiations. These proving unavailing, plaintiffs instituted specific performance proceedings. In the meantime defendant's representative Shannon was urging a speedy procurement of the deed, as defendant was anxious to begin drilling. At length the Lyfords offered to convey for an advance of $30 per acre over the contract or option price. Shannon was advised of this, and asked if he would conclude the deal and pay the $75 per acre, if the suit were settled and the lands conveyed within 10 days, to which he replied that he would, and that he would have the money to pay for the lease as soon as plaintiffs could get the deed from the Lyfords. Acting upon this, plaintiffs compromised the suit, and received the title on paying the additional $30 per acre, or a total of $70 per acre to the Lyfords, subject to the rights of the owner of the coal under said 50 acres. In conformity with their said contract, the plaintiffs thereupon executed and tendered to defendant said lease. It appears that after said land had been conveyed to plaintiffs, and a few days before the tender of the lease, defendant's well on neighboring land was completed and failed to produce any oil, indicating that there was no oil or gas in that vicinity. When the lease was tendered, defendant refused to accept the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep't Indexes

same, giving as his reason the fact that the coal rights under 50 acres thereof had been sold, and that plaintiffs had therefore not complied with the contract on their part, and claiming, also, that neither the defendant nor his agent, Shannon, had had any knowledge of the sale of said coal rights. Plaintiffs thereupon began a suit in assumpsit in the circuit court of Marion county, Ill., against defendant for damages growing out of breach of said contract, which suit was duly removed to the Circuit Court of the United States for the Eastern District of Illinois, and came to trial at the May term, 1911, upon defendant's plea of nonassumpsit. On the hearing the court held that plaintiffs had failed to furnish a good and sufficient title, and, on defendant's motion, took the case from the jury and directed a verdict for the defendant, which was duly excepted to. Thereupon plaintiffs moved for a new trial, which was denied. They then sued out this writ of error. Forty errors are assigned, most of which go to the rejection of evidence. The others, and as we regard it, the essential assignments, are contained in assignments 19 to 36, which go to the action of the court in excluding the evidence and taking the case from the jury, and directing them to find the issues for the defendant. These objections are duly preserved in the record.

Edward C. Kramer, Rudolph J. Kramer, and Bruce A. Campbell, all of East St. Louis, Ill., and L. M. Kagy, of Salem, Ill., for plaintiffs in error.

Charles P. Wise, David E. Keefe, and William E. Wheeler, all of East St. Louis, Ill., for defendant in error.

Before BAKER, SEAMAN, and KOHLSAAT, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). The language of the contract is:

"That said party of the first part [plaintiffs] for and in consideration of seventy-five dollars ($75.00) per acre for the oil and gas lease to the property hereinafter described, agrees to and with the Jennings Producing Company, party of the second part, to procure and deliver to the Jennings Producing Company, party of the second part, a lease in due form signed by the owners of said land, leasing to said party of the second part the said land for oil and gas, together with good and sufficient title,"

—to, to wit, said 162½ acres. Did this language require plaintiffs to convey to defendant an absolute estate in fee to all of said premises? The language clearly discloses that defendant was to take no estate in said tract except in the gas and oil and their appurtenances, which included such other estate as was reasonably necessary in securing to him the enjoyment of his gas and oil estate therein. He acquired no interest in the coal whatever. As was said in the concurring opinion of Justices Williams, Green, and McCullum, in Chartiers Block Coal Co. v. Mellon, 152 Pa. 293, 25 Atl. 600, 18 L. R. A. 702, 34 Am. St. Rep. 645:

"One who buys a single stratum is bound to know where it is and how it is situated with reference to the strata above and below it, and he must be conclusively presumed to have taken title subject to the servitudes imposed by nature upon it as the necessary consequence of its position among the rocks that underlie the surface. * * * We do not hesitate to enforce the servitude for support whether subjacent or adjacent, or to regulate the extent and manner in which it shall be rendered and enjoyed. With equal propriety and with equal ease, we may enforce the servitude for access and regulate the extent and manner in which it shall be rendered and enjoyed."

Earlier in the concurring opinion, it is said:

"I concur in the decision made in this case and in the opinion which so ably vindicates it, but I would go further—I would lay down the broad proposition that the several layers or strata composing the earth's crust are, by virtue of their order and arrangement, subject to reciprocal servitude, and, as these are imposed by the laws of nature and are indispensable to the preservation and enjoyment of the several layers or strata to and from which they are due, the court should recognize and enforce them."

Defendant purchased only two of the several strata which the fee embraced. Can it be claimed that he secured any interest in the remaining strata, except those of support, means of access, and removal of the gas and oil? As was said in the majority opinion of the court in the case last cited:

"While the owner of the coal may have an estate in fee therein, it is at the same time an estate that is peculiar in its nature. Much of the confusion of thought upon this subject arises from a misapprehension of the character of this estate. We must regard it from a business as well as legal standpoint. The grantee of the coal owns the coal, but nothing else save the right of access to it and the right to take it away. Practically considered, the grant of the coal is the grant of a right to remove it. This is sometimes limited in point of time; in others, it is without limit. In either event, it is the grant of an estate determinable upon the removal of the coal. It is, moreover, a grant of an estate which owes a servitude of support to the surface. When the coal is all removed, the estate ends for the plain reason that the subject of it has been carried away. The space of it reverts to the grantor by operation of law. It needs no reservation in the deed, because it was never granted. The grantee has the right to use and occupy it while engaged in the removal of the coal, for the reason that such use is essential to the enjoyment of the grant. * * * The owner of the coal must so enjoy his own rights as not to interfere with the lawful exercise of the rights of others who may own the estate, either above or below him. The right of the surface owner to reach his estate below the coal exists at all times."

Applying the foregoing statement of the law to the present case, we are of the opinion that the covenant for a good and sufficient title conveys all gas and oil rights in said premises together with all rights necessary in securing to defendant the enjoyment of his said estate, such as the right of access, the right to install the necessary plants for producing and removing the oil and gas and each of them; that such rights are subject to the natural servitudes which secure to the owners of the other strata such as surface clay and coal and any other substance located between the center of the earth within the boundary lines of said tract projected to the zenith. This doctrine is approved in Thornton on Oil and Gas, p. 367, and in Rend v. Venture Oil Co. (C. C.) 48 Fed. 248.

Defendant was in no sense prejudiced by the sale of the coal. His insistence to the contrary under the facts of this case was factitious, sired by an afterthought. The case should have been submitted to the jury, and the ruling of the district judge in that respect was error.

The judgment of the district court is therefore reversed, with directions to grant a new trial.