# T. W. Phillips Gas & Oil Co., Appellant, v. Manor Gas Coal Co.

*Mines and mining—Oil and gas lease—Drilling well through coal—Relative rights of owners—Equity.*

Where coal under land is sold with right to mine out all the coal without liability for damages to the surface, and the owner of the surface subsequently executes an oil and gas lease to another person, the lessee has a right to drill a well through the coal to reach the oil and gas. It is his duty, however, to make a proper effort to agree with the owner of the coal as to the site of the proposed well. If he makes such an effort, without success, he may file a bill in equity, and the court may then in the exercise of a sound discretion, determine the location and the fair terms upon which the well may be drilled.

If, in such a case, a bill has been filed, and it appears that the owner of the coal, through all his dealings with the owner of the lease had stood upon his supposed right of preventing any drilling whatever, and the owner of the lease has made some, but not an adequate effort to reach an agreement, and the court below dismisses the bill, the appellate court will direct that the bill be reinstated, with directions that the plaintiff shall make an effort to reach an agreement upon fair terms within a time stated but that if he does not succeed, the court shall from the testimony already taken determine where the well may be located, and the terms upon which it may be drilled.

Argued April 20, 1917. Appeal, No. 173, April T., 1917, by plaintiff, from decree of C. P. Westmoreland Co., No. 917, Equity, dismissing bill in equity in case of T. W. Phillips Gas & Oil Co. v. Manor Gas Coal Co. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, KEPHART, TREXLER and WILLIAMS, JJ. Modified and affirmed.

Bill in equity for an injunction.

RUPPEL, P. J., specially presiding, found the facts to be as follows:

1. The plaintiff, the T. W. Phillips Gas and Oil Company, is a public service corporation organized under the law of Pennsylvania and producing and supplying natural gas in Westmoreland County, and other counties in Pennsylvania.

2. The defendant is a Pennsylvania corporation engaged in mining and shipping coal in Westmoreland County, Pa.

3. Paul Brinker, being the owner of a tract of 347 acres and 113 perches of land, by deed dated August 2, 1873, recorded August 11, 1873, conveyed to the Westmoreland Coal Company all the coal of the Pittsburgh seam (and some other minerals and perhaps other seams of coal) on said tract excepting three separate parcels containing respectively, fifteen acres, fifteen acres, and seventeen acres and one hundred and thirteen perches. This grant from Paul Brinker contains the following clause:

"Together with the right and privilege to make drains on the surface and air holes, and from time to time to change the drains and air holes, or either of them, as the convenience of mining may require; and together with all mining privileges on said surface or under it necessary to the removal of all the coal underlying the same and neighboring properties; said grantee, its successors and assigns to be in nowise liable for damages, for sinking or falling in of said surface, or destroying or diverting the water flow by reason of the removal of the coal.

It being expressly understood and agreed that these stipulations are in enlargement and not in restriction of the incidental rights accruing to said grantee, in virtue of said grant of coal and mining privileges."

4. Paul Brinker having died seized in fee of the tract of land referred to in Fact 3, proceedings in partition in his estate resulted in the allotment to John B. Brinker of 78 acres and 81 perches of said tract, including in said allotment the parcel of 17 acres and 113 perches on which the coal had been reserved by Paul Brinker.

5. John B. Brinker and wife, by deed dated May 31, 1904, and recorded June 1, 1904, conveyed to the Westmoreland Coal Company all the coal on the parcel of 17 acres and 113 perches. The mining rights and exemption from liability for damage to surface and water in this deed are the same as found in the deed from Paul Brinker mentioned in Fact 3.

6. By deed dated July 2, 1907, and recorded July 3, 1907, the Westmoreland Coal Company conveyed to the Manor Gas Coal Company, the defendant in this case, all the coal of the Pittsburgh seam on the tract of 156.6 acres, including the 78 acres and 81 perches described in Fact 4, with a clause exempting from surface and water damages similar to that contained in former deeds.

7. The defendant, the Manor Gas Coal Company, is the owner of about 2,100 acres of the Pittsburgh seam of coal, composed of several contiguous tracts practically surrounding the John B. Brinker tract, and for about twenty-eight years has been conducting mining operations in said seam, and yet has about 910 acres of unmined coal in that vicinity. It has mined and removed a large portion of the coal of said seam on the Brinker tract and is employing now about three hundred miners and sometimes employs as many as three hundred and sixty miners.

8. On May 24, 1915, John B. Brinker and wife executed and delivered to the T. W. Phillips Gas and Oil Company, the plaintiff in this case, a lease on about 73 acres

of said tract, for the "purpose of mining and operating for oil and gas, . . . . . . with the exclusive right to operate the same for said purposes for the term of twenty years, and so long thereafter as oil or gas is produced in paying quantities, or operations for oil or gas are being conducted thereon, including the right to release and subdivide the same and to drill other wells . . . . . .

In consideration of the above demise, said second party agrees to deliver in pipe line unto said first party the one-eighth part of the oil produced and saved from the premises . . . . . . The party of the second part agrees to commence operations for the development of said premises for oil or gas on or before October 16, 1915, or in lieu thereof thereafter pay eighteen and 25-100 dollars every three months in advance for each additional three months the commencement of such operations is delayed from the time above mentioned for the commencement of operations, until operations are commenced. When work shall be commenced said quarter-yearly payments shall cease, and the work shall be prosecuted with due diligence until a well shall be completed, and the same shall be full consideration for the unexpired term of this agreement . . . . . . The failure of said second party to commence operations, or in lieu thereof make any of the stipulated payments as consideration for delay, as provided for herein, will render this agreement null and void."

9. Plaintiff has in all about nineteen or twenty leases on contiguous tracts surrounding the Brinker tract comprising in all about 1,500 acres; the leases being of the same tenor and import as the Brinker lease referred to in Fact 8.

10. About November 11, 1915, the defendant selected a point on the seventeen-acre piece of the Brinker tract for the location of a derrick. The derrick was completed about December 20, 1915, and drilling commenced January 25, 1916, and continued until February 4, 1916, at which time the well had been drilled to a depth of 244 feet, and through the workings of the defendant in its

mine on said tract. Further progress was prevented by the defendant. Defendant notified plaintiff that further drilling would not be permitted and also plugged the well where it passed through defendant's mine with pieces of iron, etc.

11. On October 18, 1915, the plaintiff assuming that the Westmoreland Coal Company was the owner of all the coal on the Brinker tract, wrote a letter to the superintendent of said Westmoreland Coal Company, a copy of which is attached to the bill marked Plaintiff's Exhibit B. In said letter the exact point of location of the well is designated and specifications of the drilling as follows:

"We propose to drill a hole large enough to insert 12-inch pipe to a point about 25 ft. below the bottom of the coal vein. We will then fill the hole up to the bottom of the coal vein with liquid cement. Then before the cement is set we will put in 12-inch pipe to the bottom of the drilled hole. The 12-inch pipe will have a rubber packer set out against the well a short distance above the coal vein. The space between the 12-inch pipe and the well of the hole will then be filled with liquid cement from the packer to the top. A 10-inch hole will then be drilled to a point a few feet below the 12-inch pipe. This hole will then be filled with liquid cement to a depth of about 25 feet above the floor of the coal seam and then an 8-inch pipe will be driven through the cement to the bottom of the hole. Then the space between the 8-inch pipe and the 12-inch hole will be filled with liquid cement to the top. An 8-inch hole will then be drilled to the point where the next string of casing is to be inserted, which string of casing will have a rubber packer at the bottom and the space between it and the 8-inch pipe will be left open at the top.

"If there is a rib in close proximity to our location we would prefer to drill through it if you will locate it for us, and in case we drill through the rib we would use casing and cement the same as above. We would also

like to know the approximate distance from the surface
to the bottom of the coal vein. Kindly advise us regard-
ing this matter as soon as possible, as we wish to get our
hauling done before the roads get bad."

There is no evidence that this letter ever reached the
defendant or that the defendant had any notice of the
proposed drilling by the plaintiff or of selection of point
for drilling until after the erection of the derrick.

12. On the 20th of December, 1915, the defendant
wrote the plaintiff as follows:

"You have erected a gas well derrick on the John B.
Brinker farm in Penn Township, Westmoreland County,
Pennsylvania. A gas well, if drilled at the point where
your derrick is located, would pass through the Pitts-
burgh seam of coal which at that point lies about two
hundred feet underneath the surface.

"The Manor Gas Coal Company, a corporation of the
State of Pennsylvania, is the owner of the Pittsburgh
seam of coal at and adjacent to the point where said gas
well, if drilled, would pass through, together with full
mining rights, including the right to remove all of said
coal without liability to the owner of the surface or over-
lying strata for any damages that may occur on account
of the breaking or disturbance of the surface or overlying
strata, by reason of the mining and removal of all of said
coal.

"The said gas well, if drilled at the point above men-
tioned, would pass through the active workings of the
mines of the Manor Gas Coal Company at a point where
the seam of coal is now being removed, in the process of
mining, which workings are ventilated by the air current
known as No. 4 Butt from No. 4 Level North, said air in
its course emptying into the main current of the mine,
and would be a serious menace to the health and the lives
of three hundred employees of said Manor Gas Coal Com-
pany working in said mine, and also a menace to the
property of the said coal company.

"You are hereby notified not to drill a gas well at the

point where said derrick is located, through the Pittsburgh measures of coal underneath, and that if you persist in doing so, the Manor Gas Coal Company will be forced to prevent you by taking the necessary steps to insure the protection of the lives and health of its employees and the protection of its property."

13. On the 23d of December, 1915, the plaintiff answered defendant's letter as mentioned in Fact 12, as follows:

"Your favor of December 20th to the T. W. Phillips Gas & Oil Company with regard to drilling a well on the John B. Brinker farm, Penn Township, Westmoreland County, Pa., has been referred to me as attorney for the company for reply.

"We have had some correspondence with the Westmoreland Coal Company, claiming to be the owners of the coal under this tract of land, with regard to the drilling of a well prior to the time of the location of the rig upon the farm, copy of which correspondence is herewith enclosed, together with blueprint showing location of the well, and we notified the company that we proposed drilling this well, giving its exact location and the conditions under which it was to be drilled so as to make it safe. We propose to proceed and drill a well in the manner indicated in our former letter at the place where the rig is constructed. We made our proposition to drill this well at this place upon the understanding that it would not be drilled through any opening but through the body of the coal. As we understand it, the Westmoreland Coal Company made no claim that it would be drilled at that point through any opening. If, however, it was your understanding that the drilling of the well at that place would be through an opening, we are ready and willing to change the location so that it will be drilled through the body of the coal, but think that under the correspondence we had with the Westmoreland Coal Company, with which company we infer your company is connected, this change of location should not be made at our expense.

"If you have any objection to the manner in which we proposed to drill this well, it ought to be up to you at this time to inform us of your objections and state specifically what precautions in addition thereto or in place thereof should be taken."

14. To prevent forfeitures of its several leases mentioned in Facts 8 and 9, the plaintiff has paid the several lessors the quarterly payments required in the leases until the production of oil or gas fixed the royalty to be paid.

15. Plaintiff located the site of the proposed gas well and erected the derrick without the consent of and without notice to the defendant.

16. The said well started by the plaintiff was drilled to a depth of twelve to fourteen feet below the Pittsburgh vein of coal and passed through a mined out area in said mine; and any gas escaping from said well where the same passes through said mine would be carried by the air currents throughout said mine and would endanger the lives of such employees as well as the property of the defendant.

17. There is water in said mine at the point where said well passes through defendant's mine which is highly impregnated with sulphur, and mine water corrodes and destroys iron casing. The purpose of the concrete around casing is to protect iron pipe from the ravages of mine water.

18. At the point selected by the plaintiff for said well the cover or overlying strata above the mine of the defendant is about 240 feet in thickness; and near the point where said well passes through the mine of the defendant there is a block of unmined coal containing about seven acres immediately south of said well; and to the south of said unmined block of coal, the coal in said vicinity has all been mined and removed; and it is contended on part of the defendant that on the southern side of said block of unmined coal, there is a squeeze or creep in process at this time, and that by reason of said

380 PHILLIPS G. & O. CO., Appel., v. MANOR GAS C. CO.

Statement of Facts—Opinion of the Court. [68 Pa. Superior Ct.

creep, which is caused by a lateral movement of the surface overlying said coal, it would make it especially dangerous to drill a well for oil or gas because of the danger of the pipe and the casing of the well being broken and permitting gas of the well to escape into the mine.

19. When the defendant selected a location for its well and erection of its derrick, it had constructive notice of the defendant's title to the coal in the Pittsburgh seam from the recorded deeds; and there is no evidence in the case to show that the defendant by any act or conduct on its part in any way misled the plaintiff as to the ownership of this seam of coal.

20. There is no evidence in the case to warrant the court in finding that the particular location selected by the plaintiff has any superior advantages over any other in the near vicinity, or that the plaintiff cannot select another place in close proximity to the one formerly selected by which the objections raised by the defendant could not be overcome.

*Error assigned* was decree dismissing the bill.

*T. C. Campbell,* with him *Williams, Wegley & Doran,* for appellant.

*Charles E. Whitten,* with him *John Hampton Barnes* and *Paul H. Gaither,* for appellee.

OPINION BY KEPHART, J., November 19, 1917:

The appellee is the owner of the Pittsburgh seam of coal underlying the surface of a piece of land for which the appellant has a lease for oil and gas. Appellee's title was acquired prior to the appellant's, and the appellee, under its deed, had the right to mine out all the coal conveyed without liability for damage to the surface. The bill in this case was filed to prevent interference with the drilling for oil and gas, to define the fair terms upon which the drilling might be done to pre-

serve the rights of all parties, and to recover damages for destroying the plaintiff's well. The court below dismissed the bill. It is conceded that the appellant has the legal right to drill through the coal to reach oil and gas beneath. "We have already seen that when the owner of the surface parted with the underlying coal he parted with nothing but the coal. He gave no title to any of the strata underlying it, and it is not to be supposed for a moment that the grantor parted with or intended to part with his right of access to it. We are of the opinion that he has such right of access": Chartiers Block Coal Co. v. Mellon, 152 Pa. 286-298. The court below, conceding the general proposition, bases its action for refusing equitable relief on the ground that there was not sufficient effort made by the appellant to agree with the appellee on the site of the proposed well.

No notice, except such notice as might come from the occupation of a piece of land, was given to the appellee of the intention to drill for oil and gas by the appellant. On October 18th, Mr. Cameron, general superintendent of the Westmoreland Coal Company, requested the representative of the appellant to submit a blue print giving the location of the proposed well to be drilled on the Brinker tract, and to state by letter how it was to be drilled. This request was immediately complied with by a letter fully explaining the proposed drilling, but the Westmoreland Coal Company was not the owner of this tract of land and the appellant could have ascertained who owned the land. Believing that the Westmoreland Coal Company owned the land, the appellant, without any further effort to ascertain ownership, proceeded to complete the erection of the derrick it had started. This was accomplished about December 23d. Three days before that date a notice was received from the appellee ordering the drilling to cease at the place then being drilled as the well would pass through the active workings of its mines, and if the drilling was persisted in it would be prevented. Appellant promptly

replied to this letter, enclosing a copy of the correspondence with the Westmoreland Coal Company, with a blue print showing the location of the well, and stating: "If, however, it was your understanding that the drilling of the well at that place would be through an opening, we are ready and willing to change the location so that it will be drilled through the body of the coal, but think that under the correspondence we had with the Westmoreland Coal Company, with which company we infer your company is connected, this change of location should not be made at our expense," the letter suggesting that if there were any objections to the manner of drilling, the appellant should be notified.   Not receiving any reply, the appellant proceeded with its work until the 4th of February, when the well, drilled to about twelve feet below the bed of the coal, was filled by the appellee with iron to the level of the mine.   The court found that the location selected was not safe and should be changed, and in this view of the case, which must have been known to the appellant, it was hardly justified in asking that the appellee should pay the expense of the change of location.   While the letter may have called for a reply from the appellee, its absence was not sufficient, without additional effort, to justify further drilling, in view of the reason given by the appellee.   The main objection was that the well was too near the active workings of the mine, and there was a possibility that it might be destroyed by a "creep" in the mine.   This "creep" was discovered south of a block of coal.   This block extended two hundred feet in width and seven hundred and fifty feet in length; it was approximately seven acres of coal.   It had been left standing to protect the northern part of the mine.   The well had been drilled in the northern part of this block.   Beyond it, the coal had been mined out, and the roof had fallen at a point about one hundred and fifty feet from the place where the well was drilled.   This break could be seen on the surface.   Two butt ends had been driven

into this block of coal and in some of the workings roof falls had been noticed. Some of the witnesses testified that sixty-five per cent. of this coal was mineable, while others stated that to remove any of the coal would be exceedingly dangerous. It seemed to be the purpose of the appellee to have the appellant locate its well within this seven acres and to pay for four acres of so-called mineable coal at the rate of $2,000 per acre. All the witnesses agreed that a piece of coal two hundred feet square would amply protect the casing of the well from the "creep"; but as thirty-five per cent. of the coal could not be mined out because of the "creep," it would be unreasonable, if the well had been located therein to require them to pay for the coal under these conditions. The appellee could very easily specify what portion of the coal it proposed to leave stand, and the appellant could sink its well in the part remaining. It is possible when the appellant reaches the supposed gas-bearing strata, it may not find gas. It would then be unfair to require it to pay a large sum of money, or any sum of money, for any coal that might surround the pipe. We do not wish to be understood as saying that it is absolutely necessary to leave mineable coal around a gas pipe to protect it, or where the court determines that it is necessary that the owner should not be compensated for that coal. There may be cases where such precaution would be necessary, although of the five thousand or more wells that were testified to as having been drilled through coal measures, all the witnesses admitted that there has been no report of loss of life or accident through the escaping of gas occasioned by these wells; and many have been drilled through the mined-out portions of the territory. The extent of mining on the east and west of the seven-acre tract was not developed as the main haulage ways were along these sides of this tract.

The right to drill for oil or gas is a property right not dependent on the will or caprice of the owner of the in-

termediate strata of coal or ore; it is to be exercised with due regard for the rights and safety of those who may be affected thereby. Like every other right, the exercise of which may result in the taking or jeopardizing the property of another, or is reasonably dangerous to life, courts of equity may and will regulate and control the exercise of such right by establishing safeguards as the circumstances require; so that its owner may not be deprived of the value of his right or that others who are brought in contact with it will not be unnecessarily injured or threatened with injury. We agree with the conclusion that the demands of the appellee were unreasonable. All through the case, from the evidence, it stood on its supposed right of preventing any drilling whatever by the appellant.

The court correctly stated the law that the "lessees have the right to bore through the coal or the mined-out portions of the coal in order to reach the oil or gas below the coal strata, but that in doing the drilling for this purpose, the rights of the coal owner must be properly observed, and the golden rule of business kept constantly in mind." The location of the well should have been the subject of an amicable agreement, if possible, and when the parties failed to agree, it then became a matter within the sound discretion of the chancellor, to be designated with due regard to the rights of both parties. While the Supreme Court in the case of Chartiers Block Coal Co. v. Mellon, supra, was not willing to hold that the location of the well could be determined by a chancellor within the equitable powers of the court, stating as their belief it was for the legislature to enact some method whereby a site might be selected, yet for twenty-five years the legislature has failed to act and during that time the lower courts have, within their equitable powers, made the selection. The appellant does not object to this, and as it has a legal right to drill through the coal, we see no reason why a court of equity should not enforce it. The procedure adopted by the

court below in the case of Chartiers Block Coal Co. v. Mellon, supra, appears to be equitable. Where it appeared that some damage might follow, a bond to indemnify against loss was required. As we said above, these are matters within the discretion of the chancellor.

While the appellant did not make a proper effort to agree with the appellee on the location, some effort was made and it should not be forced to institute a new action when all rights may be adjudicated in the present proceeding. The appellant does not lose such right to relief because it did not select one of the several blocks of unmined coal offered by the appellee. That offer should be taken in connection with the testimony as to the value placed on the coal; it was indefinite and required the action of the court before it could have been accepted.

The decree of the court below is modified in that the bill is reinstated and leave is given to the appellant, within sixty days, to endeavor to agree with the appellee upon the fair terms and the place where the drilling might be done, and if the parties are unable to agree, the appellant may present the matter to the court below, who shall, from this testimony, determine the location and the fair terms upon which the well might be drilled. In the event of the failure of the appellant to make any effort to agree with the appellee as indicated herein, then the bill to be dismissed, and the decree of the court below as thus modified is affirmed at the cost of the appellant.