FIRST NAT. BANK OF HAILEY v. G. V. B. MIN. CO. (BROWN et al., Interveners).

(Circuit Court, D. Idaho. September 17, 1898.)

1. FORECLOSURE OF MORTGAGE—MINING PROPERTY—RIGHTS OF LESSEE DURING RECEIVERSHIP.

The lessee of a mine who took his lease with knowledge of the existence of a mortgage thereon, and continued to work the mine during a receivership, pending foreclosure of the mortgage, is not entitled to claim the entire product as against the mortgagee, on the ground that its value is less than the cost of its production, where the mine was fully developed, and his working reduced, rather than increased, its value.

2. SAME—MORTGAGE BY PART OWNERS—LIEN OF CO-TENANT ON PRODUCT.

Where two of three owners of a mine, claiming, with color of justification under the judicial decisions, to have succeeded to the interest of their co-tenant, engage in working the mine, and in the ordinary course of business, and in good faith, execute a mortgage on the entire property, their co-tenant, who afterwards established his title to a one-third interest in the mine, cannot, as against the mortgagee, claim a lien on the ore produced during a receivership, for his share of past profits due from his co-tenants.

3. MINING PARTNERSHIPS—HOW CREATED.

Under the statute of Idaho relating to mining partnerships, where part owners of a mine, claiming to own the entire interest, without consent of their co-tenant, engage in working the mine, a mining partnership does not exist between them and their co-tenant.

On demurrers to pleas in intervention filed by Arthur Brown and Henry Aplington, each claiming the product of the mortgaged mining property during the receivership.

Lyttleton Price, for plaintiffs.

A. F. Montandon, for defendants and intervener Aplington.

Intervener Brown, in pro. per.

BEATTY, District Judge. The action of the complainant against the defendant mining company for the foreclosure of a mortgage, given by it to complainant upon the Red Elephant group of mines, to

secure its debt, has been reduced to judgment in favor of complainant; but pending the action the proceeds of ores, to the amount of $7,617.34, resulting from the operation of the mines by Henry Aplington, as the lessee of the defendant company, were placed in the possession of the court's receiver, to await the conclusion of the action. Arthur Brown and said Aplington have intervened, claiming such ore proceeds; and, to their pleas of intervention, demurrers have been interposed. Intervener Brown shows that, long prior to the creation of the debt and mortgage, George V. Bryan, George W. Venable, and George H. Roberts owned the mines, and were jointly working them; that, during the year 1889, Bryan and Venable claimed to have succeeded to Roberts' interest, and thereafter operated the mines, to the exclusion of Roberts, and subsequently conveyed them to the mining company; that Roberts transferred his interest to Brown, who thereupon instituted his action to maintain his title to an undivided one-third interest in such mines, which has terminated in the establishment of his title, as claimed by him. Upon these facts, it is conceded by both the bank and Aplington that Brown is entitled to one-third of said ore proceeds, but he claims them all for reasons hereinafter stated.

1. Aplington, under whose lease these ore proceeds were produced, while conceding one-third thereof to Brown, claims the balance, and especially urges that he is entitled thereto because of his time, labor, and expense incurred in their production, which he claims were in value far in excess of the value of the ore extracted. Both the bank and Brown demur to Aplington's plea of intervention, assigning that his contract of lease was made after their claims originated. Aplington concedes to Brown the one-third of such proceeds because of the priority of Brown's title over his lease. The same reasons which justify this concession will support the superiority of the bank's claim, which was also prior to Aplington's lease, and of which he had notice when he took his lease. Whatever may be the rule in some cases as to allowance for labor and expenses, I do not think that, under the circumstances of this case, the claim of Aplington should be allowed. The bank relied for its security upon the value of the mines. That value is alone dependent upon the ores they contain. A mere mining prospect might, by working, be improved in value; but these mines had been worked for years prior to this lease, and the chief object of Aplington in working them must have been the extraction of their ores. Under such circumstances, it may be presumed that the value of the mines would be depreciated rather than increased. From all that has appeared in the case concerning the condition of the property, it certainly would sell for less after Aplington ceased working than when he commenced. This is not alone because of the ore extracted, but chiefly because such working has more clearly shown that the mines may not be valuable. His operations have tended to demonstrate that the value placed upon them when the mortgage was taken was conjectural rather than real. This conjectural value in mines is very often the chief value to the mine owner, but to it, such as it may have been in this case, the bank was entitled. Had Aplington been working under his lease by the agree-

ment of the bank, he might have had some claim for his services and expenses, but, as to the bank, he was a volunteer. He took his lease in the face of the fact that the bank held the mines as its security, and upon his own responsibility proceeded to work them, which resulted in a depreciation of the value of the bank's security. In a former partial examination of the relations of these parties, Aplington was allowed three-fifths of the ore, and some other items, towards the payment of his expenses. The conclusion then reached will not now be disturbed, and the demurrers to his plea of intervention are sustained.

2. Intervener Brown, in support of his claim for all the fund, says that these parties had legal notice of his ownership of the one-third interest in the mines; that he, as the successor to Roberts' interest, became a mining partner with his co-owners in working the mines, and they together constitute a mining partnership; that such working resulted in large profits, to the one-third of which he was entitled, but which was not paid him; that he has a lien for the unpaid profit due him upon all subsequently extracted ores; and he claims this, not only against his co-tenants, but also as against their creditors, including the bank. It may be here suggested that there is nothing in this record to indicate any bad faith on the part of the bank in taking this mortgage. In fact, not only the bank, but all parties, were, from the great weight of judicial decision, including a pointed and direct decision by the supreme court of the United States, rendered prior to the execution of the mortgage, justified in believing that Bryan and Venable had succeeded to the title of Roberts, and that the mining company had the right to mortgage all of the mining property. Also, it may be suggested that the debt was incurred, and that the mortgage was executed by the mining company, which was operating the property, in the usual course of business, and, so far as appears, in good faith by all parties. If this were a claim by Brown against his co-tenants, there could be no doubt he could have a claim against present ore proceeds for the payment of past unpaid profits due him from his co-tenants. He urges that the bank not only should have taken notice of his title to the one-third of the mines, but also should have taken notice of the state of the account between him and his co-tenants. It was a hardship to the bank to find that one-third of its security was swept away, but to this any citizen is liable when his construction of the law differs from that of a controlling court; but to lose all its security because it failed to examine, for years past, the private accounts of these parties, which were in no sense public records, or in any legal way accessible to an examination by the bank, would seem a greater hardship than the law imposed. Mortgagees, for the validity of their securities, may rely upon facts appearing in legal public records, and are not bound by those of a private nature existing between parties, unless they have actual notice thereof.

There has been some discussion of the peculiarities of the law of "mining partnership," as applicable to the facts in this case. It is, however, deemed unnecessary to pursue that subject, but rather confine ourselves to an application of the laws of Idaho, which, by Rev.

St. §§ 3300–3309, inclusive, define such partnership, and regulate the relations and duties of mining partners towards each other. This statute determines that such partnership exists when the owners of a mining property "actually engage in working the same," and that no "express agreement" is necessary, but that the relation exists when the "ownership" and "working" of the mine by the parties exist. This language seems to indicate that a mining partnership exists only between those owners who actually engage in the working, or, by some consent or understanding with each other, agree to it. It seems clear from the statute that, if two of three joint owners work without the consent of the third, they cannot thereby make him, or his interest in the mine, liable for the debts they incur, nor do they deprive him of his share of any resulting profits. If they do not make him nor his interest liable for the debts, a partnership cannot exist, for one of its chief elements is liability of each partner for its debts. It seems clear that the two partners assuming to work the mine and their interests in it, alone are liable for the debts they contract. If a mining partnership has all these years continued between Brown and the mining company, then, even if he has not in the past received his share of the profits resulting from the working by said company, he would still be liable for the debts incurred by his partners, and not entitled to the one-third of the ore proceeds already conceded to him. If this intervener has a lien against these proceeds, as claimed, then he must have a claim against the interest in the mine owned by his cotenant, the mining company; and, although no record and no public notice exists of such a lien, an innocent purchaser of the mining company's interest in the mine would buy subject to this lien. For so unusual and harsh a rule there should be some statutory authority.

The statute referred to provides for a lien on the "partnership property" in favor of a member of a mining partnership, only "for the debts due the creditors thereof, and for money advanced by him for its use." Moreover, this statute directs that "a lien exists in favor of the creditors, notwithstanding there is an agreement among the partners that it must not"; thus clearly preferring the claims of the creditors upon the company assets over the claim of a member for his share of the profits. Other provisions of the statute, in defining the status of purchasers in the mining property, are equally careful to guard the interests of the creditors. From a consideration of this statute it is concluded that the intervener Brown was not a member of a mining partnership in the working of these mines; that while his exclusion from the partnership does not exclude his claim to a one-third of the profit of such working, nor exclude him from any claim against his co-owners for their portion of present profits in payment of past unpaid profits due him, as against the complainant, who is the creditor of such mining company, he has no claim for the remaining two-thirds of such profits. It is therefore ordered that after deducting from said sum of $7,617.34, now in the possession of said receiver, the sum of $100 allowed the receiver, and any other lawful costs or charges that should be paid therefrom, there be paid, of the balance, one-third to intervener Arthur Brown, and two-thirds to complainant, the First National Bank of Hailey.