## KEMMERER v. MIDLAND OIL & DRILLING CO.

(Circuit Court of Appeals, Eighth Circuit. December 21, 1915.)

No. 4075.

1. INDIANS ☞16—LEASE OF LANDS—SUBSEQUENT LEASE OF MINING RIGHTS.

Even in the absence of statute the owner of land in fee who has leased the surface without reservation has the right to drill through the surface for oil or gas, and may convey that right by lease to another; but as to Indian lands coming within its scope such right is reinforced by Act May 27, 1908, c. 199, § 2, 35 Stat. 312, which provides that "leases of restricted lands for oil, gas or other mining purposes, leases of restricted homesteads for more than one year, and leases of restricted lands for periods of more than five years, may be made, with the approval of the Secretary of the Interior," the effect of which is to make a severance of the oil and gas right from the surface.

[Ed. Note.—For other cases, see Indians, Cent. Dig. § 45; Dec. Dig. ☞16.]

2. INJUNCTION ☞135, 161—PRELIMINARY INJUNCTION—DISCRETION OF COURT.

The granting or dissolution of an interlocutory injunction rests in the sound judicial discretion of the court of original jurisdiction, and one of the rules with reference to the granting of such injunctions is that the court will take into consideration the amount of damage which the plaintiff will sustain if an injunction be not granted, and the amount which defendant will sustain if it be granted, although such considerations can have no weight, if the rights of one of the parties are clear and indisputable.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 304, 347; Dec. Dig. ☞135, 161.]

3. INJUNCTION ☞161—DISSOLUTION OF TEMPORARY INJUNCTION—DISCRETION OF COURT.

In a suit by the lessee of land for agricultural purposes to enjoin a subsequent lessee of the oil and gas rights from drilling a well on the premises, it was within the discretion of the court to dissolve a temporary injunction previously granted, where it appeared from the showing made that the injury to complainant's rights from the drilling of such well would be trifling.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 347; Dec. Dig. ☞161.]

Sanborn, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

Suit in equity by O. Kemmerer against the Midland Oil & Drilling Company. From an order dissolving an interlocutory injunction, complainant appeals. Affirmed.

J. A. Tillotson, of Nowata, Okl. (Tillotson & Elliott and A. C. Hough, all of Nowata, Okl., on the brief), for appellant.

James C. Denton, of Muskogee, Okl. (W. A. Chase, of Nowata, Okl., on the brief), for appellee.

Before SANBORN, ADAMS, and SMITH, Circuit Judges.

SMITH, Circuit Judge. [1] John S. Woodard, a Cherokee Indian, leased, by written instrument dated December 26, 1911, and ap-

proved by the Secretary of the Interior under date of December 19, 1912, to O. Kemmerer 40 acres of land for five years, beginning on January 1, 1913, for $50 a year, being $2 per acre for the east 20 acres and 50 cents per acre for the west 20 acres. This instrument was duly filed for record on January 21, 1913. This lease is headed "Agricultural Lease," and recites that it is executed "under and in accordance with the provisions of existing law and the rules and regulations prescribed by the Secretary of the Interior relative to agricultural leases on restricted lands of allottees of the Five Civilized Tribes." It is stipulated in said lease that "the lessee agrees * * * to work and farm said premises in a good husbandlike manner." Seven times the petition refers to the lease as an "agricultural lease."

On November 6, 1912, said John S. Woodard made a lease to the Midland Oil & Drilling Company for 10 years of all the oil deposits and natural gas in or under the same land leased by "agricultural lease" to Kemmerer. This lease was filed for record with the superintendent of Union Indian agency the 6th day of December, 1912, and before the lease to Kemmerer was approved by the Secretary of the Interior. It was filed for approval February 18, 1913, and was approved by the Secretary of the Interior April 9, 1913. Both these leases were executed in pursuance of the authority conferred by the act of May 27, 1908, which, so far as material, is as follows:

"That leases of restricted lands for oil, gas or other mining purposes, leases of restricted homesteads for more than one year, and leases of restricted lands for periods of more than five years, may be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise." 35 Stat. 312.

Shortly after approval by the Secretary of the Interior of the agricultural lease to Kemmerer, he took possession of the tract under the same. The 40 acres in question was then fenced, but had no buildings thereon. The east 20 acres was then broken out and under cultivation, but the west 20 acres was still in prairie grass. About June 6, 1913, the Midland Oil & Drilling Company entered upon the northwest corner of the 40—that is, upon the land in prairie grass— took possession of about one-half acre, installed a drilling machine, and commenced to drill for oil and gas. It is expressly stipulated that the Oil Company has used only such portion of the surface as was necessary to properly develop said land for oil and gas. This suit was brought by Kemmerer against the Oil Company in the district court of the county of Nowata to enjoin the prosecution of drilling by the Oil Company and a temporary injunction was granted in the state court. The case was then removed to the United States District Court for the Eastern District of Oklahoma. Several orders were there made as to the temporary injunction, which was finally dissolved, and the plaintiff appeals.

It is settled law that the right to excavate coal under the surface of land is a corporeal hereditament. Lillibridge v. Lackawanna Coal Co., 143 Pa. 293, 22 Atl. 1035, 13 L. R. A. 627, 24 Am. St. Rep. 544. It is equally well settled that in a fugitive article like oil or gas the right to bore or mine for it is an incorporeal hereditament. Priddy

v. Thompson, 123 C. C. A. 277, 204 Fed. 955. In the latter case we held an action of ejectment would not lie to recover an incorporeal hereditament, but it does not follow that an action of injunction will lie to prevent exploration by the owner of such incorporeal right.

The petition fairly shows that the defendant had been in possession of the northwest corner of the land in question and boring for oil and gas for nearly a week when this suit was brought. It seems to be settled that the original owner of the fee to land owns from the clouds to the center of the earth; that he can plat and subdivide the surface of the earth within his own boundaries substantially according to his will and pleasure is beyond question; in other words, he can by vertical planes subdivide his property as he chooses. In like manner he may subdivide his property by as many horizontal planes as he may see fit, either above or beneath the surface of the earth. The writer well remembers when the owner of property adjacent to a large hotel was about to erect a building which would preclude all air and light from one side of the hotel. The city commenced condemnation proceedings to take enough of his property for alley purposes to insure light and air to the hotel. To avoid condemnation proceedings the property owner conveyed his entire tract to the proprietor of the hotel, who conveyed back to him the lot below the second story windows and reserved the title from the top of the first story to the sky, thus asserting at least the power to divide the property by a horizontal plane about 20 feet above the ground.

The most common illustration of the right to divide property by horizontal planes as well as by vertical planes is of course found within the earth's crust. It is a common thing for the owner of a portion of the earth's crust to convey the coal or other mineral beneath the surface, and thus the owner of the surface has parted with a stratum or strata in the midst of what was once his, and continues to own from the center of the earth to the bottom of the part sold and from the top of the part sold to the clouds, while the vendee owns the part conveyed.

No case that we have found involves the right of the parties in case of a sale of a part of a stratum. Ordinarily the sale or leasing of a stratum beneath the surface by implication carries with it the right to the use of so much of the surface as may be actually necessary to mine from the stratum conveyed. Cases directly in point with this one are very rare.

In Rend v. Venture Oil Co. (C. C.) 48 Fed. 248, a temporary injunction was sought by the owner of a coal mine to restrain the sinking of an oil and gas well through it where at the particular place where the well was being sunk the coal had been mined, except sufficient of it to furnish the necessary support to the surface above. It seems to have been assumed in that case either that the defendant had an implied right to go through the coal mine, or at least that the owner of the coal mine must show that there would be danger of explosion or the like in the mine from escaping gas. This last would not be true unless there was a general right to go down through

the coal mine by the oil company. This case was decided in November, 1891.

The next case, and one more nearly in point, is Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 Atl. 597, 18 L. R. A. 702, 34 Am. St. Rep. 645. That case was decided in January, 1893. The court was divided upon some questions four to three. It was unanimously agreed, however, that where the owner of an entire tract leased or sold the coal beneath his tract, without any reservation of a right of way through the coal to explore for oil or gas or anything else, and when it was unlikely that either the owner of the surface or his vendee of the coal knew of the existence of oil or gas beneath the coal, and subsequently the owner of the surface leased the oil and gas privilege to a third person, who commenced to bore from the surface down through the coal in search of oil and gas, that the right of access to the oil and gas existed always, and in the absence of statute the owner of the coal could not rightfully procure a temporary injunction to restrain the oil and gas lessee from boring through the coal. The difference between the members of the court was as to the extent of the powers of a court of equity and the necessity for legislation on the subject.

On the same day, in Mansfield Coal & Coke Co. v. Mellon, 152 Pa. 286, 25 Atl. 601, the Supreme Court of Pennsylvania followed the case of Chartiers Block Coal Co. v. Mellon. In Telford et al. v. Jenning Producing Co., 121 C. C. A. 516, 203 Fed. 456, the case of Chartiers Block Coal Co. v. Mellon, supra, is cited and quoted from at length with approval.

While the questions here involved have not often been considered the announcement in the Chartiers Block Coal Co. Case has never been questioned, so far as we can ascertain, in the more than 22 years since its announcement. If these cases are correct, there can be no doubt that the decision of the court below was correct, because if the grant of a right in the subsurface necessarily implies the right of access, and if the grant of the first stratum below the surface necessarily implies a right to penetrate that stratum by the grantor or his lessee in reaching a stratum below, even where such right has not been reserved, then the same right of access exists as against the owner of the surface and in favor of the owner or lessee of a stratum below, even though no such right was reserved in a lease made of the surface.

II. This point is strengthened in this case by the federal statute heretofore referred to. It is provided in section 2 of the act of May 27, 1908 (35 Stats. 312):

"That leases of restricted lands for oil, gas or other mining purposes, leases of restricted homesteads for more than one year, and leases of restricted lands for periods of more than five years, may be made, with the approval of the Secretary of the Interior."

By thus expressly authorizing, with the approval of the Secretary of the Interior, the leasing of the oil and gas right in what was formerly Indian Territory, Congress itself made a severance of the oil and gas right from the surface, and of necessity authorized access to

the oil and gas, and this more than three years before the lease to the plaintiff was even executed by the Indian allottee, and more than four years before his lease was approved by the Secretary of the Interior.

III. The land taken was a part of the unbroken prairie. This was leased to plaintiff at 50 cents per acre cash and 40 cents per acre on the 1st day of January of each year thereafter for five years. The defendant took possession of one-half an acre. There is nothing to indicate this half acre was of more or less rental value than the average, or than the plaintiff had agreed to pay. Presumptively the one-half acre was worth 25 cents a year, or $1.25 for the entire period of the lease. He now seeks, upon this trifling investment of 45 or perhaps 65 cents, and his promise to pay 20 cents a year for three or four more years, and his promise to pay not to exceed a total of $1.25, to obstruct the exploration of this land for oil and gas until the expiration of his lease. In the meantime it appears there were three wells' adjacent to the land, which were sucking out the oil and gas beneath this land, perhaps to the total loss of the chief value of this land to the Indian. It is very questionable whether over so small a matter to the plaintiff the law would concern itself at all. "De minimis non curat lex."

[2, 3] IV. It was said in American Grain Separator Co. v. Twin City Separator Co., 120 C. C. A. 644, 648, 202 Fed. 202, 206, that:

"The granting or dissolution of an interlocutory injunction rests in the sound judicial discretion of the court of original jurisdiction, and, where that court has not departed from the rules and principles of equity established for its guidance, its orders in this regard may not be reversed by the appellate court without clear proof that it abused its discretion. The question is not whether or not the appellate court would have made or would make the order. It is to the discretion of the trial court, not to that of the appellate court, that the law has intrusted the power to grant or dissolve such an injunction, and the question here is: Does the proof clearly establish an abuse of that discretion by the court below? Fireball Gas Tank & Illuminating Co. v. Commercial Acetylene Co., 198 Fed. 650, 653 [117 C. C. A. 354]; Massie v. Buck, 128 Fed. 27, 31, 62 C. C. A. 535, 539; Love v. Atchison, T. & S. F. Ry. Co., 185 Fed. 321, 330, 107 C. C. A. 403; High on Injunctions (4th Ed.) § 1696; Higginson v. Chicago B. & Q. R. R. Co., 102 Fed. 197, 199, 42 C. C. A. 254, 256; Interurban Ry. & Terminal Co. v. Westinghouse E. & Mfg. Co., 186 Fed. 166, 170, 108 C. C. A. 298, 302; Kerr v. City of New Orleans, 61 C. C. A. 450, 454, 126 Fed. 920, 924; Thompson v. Nelson, 18 C. C. A. 137, 138, 71 Fed. 339, 340; Société Anonyme Du Filtre Chamberland Sys. Pasteur v. Allen, 33 C. C. A. 282, 285, 90 Fed. 815, 818; Murray v. Bender, 48 C. C. A. 555, 559, 109 Fed. 585, 589;' U. S. Gramophone Co. v. Seaman, 51 C. C. A. 419, 423, 113 Fed. 745, 749."

That opinion was by Sanborn, Presiding Judge, and was again approved by him in the case of Magruder v. Belle Fourche Valley Water Users' Association, 133 C. C. A. 524, 219 Fed. 72.

One of the rules with reference to the granting of a temporary injunction is that the court will take into consideration the amount of damage which the plaintiff will sustain if an injunction be not granted and the amount which the defendant will sustain if it be granted. Of course such considerations can have no weight if the rights of one of the parties are clear and indisputable, but under the facts of this case we entertain no doubt that the District Court was well within its discretion when it dissolved the injunction in this case.

It follows that for all of the reasons assigned in this opinion the action of the District Court in dissolving the injunction must be affirmed.

SANBORN, Circuit Judge (dissenting). While the value of the property which is the subject of this litigation is not large, and the amount of damage which is being inflicted upon the plaintiff is apparently small, the controlling questions of law which it presents seem to me to be of general and public interest, and the decision of them by the majority, if that decision should pass into precedent, cannot fail to have far-reaching and lasting effects upon the property and upon the value of the property of many who are not parties to this lawsuit. The main question in the case is: May the owner of a tract of land, who has leased it for years without any reservation, restriction, or exceptions to a lessee who has taken possession thereof under a lease, vest in a second lessee by a subsequent lease of the right to take oil or gas from the land, or by any other subsequent grant or lease, the right to deprive the first lessee of his right to the exclusive possession of every part of the surface of and of the land itself during the term of his prior lease? The majority answer this question in the affirmative. It seems to me that it should be answered in the negative.

The leases in controversy took effect when they were respectively approved by the Secretary. Before the dates of those approvals they were respectively ineffective. Hence, in legal effect, Woodard, the owner of the land, leased it to Kemmerer on December 14, 1912, and, after Kemmerer had taken possession under his lease of the land which was already inclosed by a fence, and on April 9, 1913, Woodard leased to the Midland Oil & Drilling Company the oil and gas deposits in the land and so much of the surface thereof as should be reasonably—

"necessary to carry on the work of prospecting for, extracting, piping, storing, and removing such oil and natural gas, also the right to obtain from wells or other sources, by means of pipe lines or otherwise, a sufficient supply of water to carry on said operations."

The subsequent lessee on June 6, 1913, over the protest of the first lessee, entered upon about half an acre of the land, placed a Star drilling rig thereon, and commenced to drill for oil and gas therewith. The majority are of the opinion that the lessor of this subsequent lease lawfully vested in the subsequent lessee a right to the exclusive possession and use of the half acre tract which it has seized, a right which is superior to the right to the exclusive possession thereof which the lessor had previously granted to the first lessee. If this conclusion be right, it necessarily follows that the lessor by the subsequent lease vested in the second lessee a right superior to that of the first lessee to the exclusive possession and use of every part of the surface of this land which then was or should thereafter become necessary to enable the second lessee to prospect for, extract, pipe, store, and remove the oil or gas it might find therein, to sink wells for water therein, and to pipe it in order to carry on its operations, and, if all the surface be or should become necessary for these purposes, then he

took that from his first lessee, and vested in the second lessee the right to the exclusive possession of all the surface of the land previously leased to Kemmerer. It seems to me that the decision ought to be that by the first lease the absolute right to the exclusive possession of the entire tract of land to the exclusive possession of every inch of its surface and of every other part of it was vested in the first lessee, and that thereafter the lessor had no right or power to revoke any part of his grant, or to vest in the second lessee any right whatever to interfere with or disturb the first lessee's exclusive possession of every part of the surface of the land, much less to evict him from it, or from any part of it. The following principles of law and facts converge with compelling power to force my mind to this conclusion:

It is true that the words "Agricultural Lease" are printed at the head of the first lease, and that that lease is repeatedly called an agricultural lease by the parties and their counsel in this proceeding, and that the words "Oil and Gas Mining Lease" are printed at the head of the second lease, and it is so called. But neither of these terms appears in any of the stipulations or covenants contained in either of the leases, and their legal effect must be deduced, not from the names printed at their heads, or applied to them, but from the written agreements which the leases contain and which the parties deliberately signed when they executed the writings. The controlling parts of the lease to Kemmerer are:

"The lessor doth hereby let and lease unto the said lessee the lands and premises described as follows, to wit: W. ½ of the S. E. ¼ of the S. W. ¼ and the N. ½ of the S. W. ¼ of the S. W. ¼ of section 4, township 25, range 17 east, and containing 40 acres, more or less, for the period beginning on the 1st day of January, 1913, fully to be completed and ended on the 31st day of December, 1917, subject to the conditions hereinafter provided for. The said lessee, in consideration of said premises as above set forth, covenants and agrees with the lessor to pay said lessor, as rental for the same, the sum of two hundred and fifty dollars, * * * to keep said premises in good repair, to work and farm said premises in a good husbandlike manner, * * * and to turn the same over at the expiration of this lease in as good condition as they now are, the usual wear, inevitable accidents, and loss by fire excepted. * * * The covenants and agreements hereinbefore mentioned shall extend to and be binding upon the heirs, assigns, executors and administrators of the parties to this lease."

This lease contains no restrictions to agricultural, mining, or any other purpose; no exceptions; no reservations. It was a lease, not of the surface only, nor of any stratum only, but of the lands and premises described in it. It was a lease, not of the right to the possession and use of the premises for farming, or for any other single purpose only; but it was a lease of the entire lands and premises described for the term of years specified in the lease, and in my opinion its legal effect was to vest in the lessee the right to the exclusive possession of every part of the entire surface of the land and premises and of the land itself described therein during the full term of the lease, and to assure that exclusive possession by the implied covenant of quiet enjoyment of the lessor to the effect that the lessee paying the rent should peaceably and quietly have, hold, and enjoy the possession of every

part of the premises for the term mentioned. It vested in the lessee an estate for years, and it divested the lessor of all right to the possession or control of every part of the surface of the premises and of the premises themselves until the expiration of the lease and left him nothing but the reversion. The books upon examination seem to me to demonstrate these conclusions and to illustrate the jealousy with which the courts guard this right of a lessee for years to the exclusive possession of the premises leased to him.

"The legal understanding of a lease for years is a contract for the possession of land for a determinate period with the recompense of rent," said the Supreme Court in United States v. Gratiot, 14 Pet. 526, 538, 10 L. Ed. 573, cited in Raynolds v. Hanna (C. C.) 55 Fed. 783, 800; Pelton v. Minah Consolidated Min. Co., 11 Mont. 283, 28 Pac. 310, 311. And this was such a lease. "It is obvious that in principle the right of a lessee is the same as that of the purchaser in fee," said the Supreme Court in Waskey v. Chambers, 224 U. S. at 564, 565, 32 Sup. Ct. 597, 598 [56 L. Ed. 885, Ann. Cas. 1913D, 998]. "A lease is a contract between the lessor and lessee, vesting in the latter a right to the possession of the land for a term of years. * * * It becomes an estate when it takes effect in possession." Tiedemann on Real Property, § 538. Such an estate vested in Kemmerer when he took possession under his lease. "And as soon as a lessee shall have entered under a written lease the lessor is so effectually divested of the possession that he cannot maintain trespass against a stranger who should enter and cut trees upon the premises, although the tenant himself is restricted from cutting them (Greber v. Kleckner, 2 Pa. 289, 291), though, had he excepted them in his lease, he might have maintained trespass for cutting them (Schermerhorn v. Buell, 4 Denio [N. Y.]) 422, 423; Van Rensselaer v. Van Rensselaer, 9 Johns. 377). In the former case the tenant might have trespass for the cutting of the trees if done by a stranger, and the owner of the inheritance trover for the value of them. Burnett v. Thompson, 51 N. C. 210, 213. But the lessor would have no right to enter upon the premises, although the lessee should have actually left and abandoned possession of the same. Shannon v. Burr, 1 Hilton, 39." 1 Washburn on Real Property, 497, 498. If by a lease for years a lessor is so effectually divested of the right of possession that he cannot maintain trespass for trees cut by a stranger which the lessee is restricted by the lease from cutting, the lessor in this case certainly could not lawfully deprive, or empower another to deprive, the prior lessee of the exclusive possession of any part of the surface, or of any other part of the land leased.

A lessee can maintain trespass against his landlord for forcibly breaking and entering the leased premises during the term. Barneycastle v. Walker, 92 N. C. 198. He may recover damages for wrongful dispossession by his landlord. Miller v. Uhlman (D. C.) 198 Fed. 233, 241, 242. A demise of premises in possession of lessees under a prior valid lease is void. It is neither effectual lawfully to disturb the prior lessees in possession or lawfully to evict them. Post v. Martens, 25 N. Y. Super. Ct. 437, 439.

Again, the entry upon and interference with the exclusive possession of Kemmerer by the lessor, or by the Midland Oil Company claiming under him, by a subsequent lease, was wrongful and without justification because it was a breach of the lessor's implied covenant of quiet enjoyment with Kemmerer which runs with the land and to which the Midland Oil Company's claims are subject. The law implies from the use in a lease of the word "let" or the word "lease" a covenant with the lessee for the latter's quiet enjoyment of the premises leased against the lessor and against all claiming under him. Duncklee v. Webber, 151 Mass. 408, 24 N. E. 1082; Owens v. Wight (C. C.) 18 Fed. 865; Playter v. Cunningham, 21 Cal. 229, 233; Hart v. Windsor, 12 M. & W. 68, 85; Lanigan v. Kille, 97 Pa. 120, 125, 39 Am. Rep. 797; Maule v. Ashmead, 20 Pa. 482, 484; Ross v. Dysart, 33 Pa. 452, 453; Maeder v. City of Carondelet, 26 Mo. 112, 114, 115; Hamilton v. Wright's Adm'r, 28 Mo. 199, 205, 206; Wade v. Halligan, 16 Ill. 507, 511; Abrams v. Watson, 59 Ala. 524; Pickett v. Ferguson, 45 Ark. 177, 199, 55 Am. Rep. 545; Field v. Herrick, 10 Ill. App. 591; Avery v. Dougherty, 102 Ind. 443, 2 N. E. 123, 125, 52 Am. Rep. 680; City of New York v. Mabie, 13 N. Y. 151, 154, 64 Am. Dec. 538; Edwards v. Perkins, 7 Or. 149; Steel v. Frick, 56 Pa. 172, 174. This covenant of quiet enjoyment runs with the land. Shelton v. Codman, 57 Mass. (3 Cush.) 318. And the lease to Kemmerer contains an express contract that it shall do so. The stream cannot rise higher than its source, the subsequent lessee has no better right to disturb the exclusive possession of the first lessee than the lessor has, and the lessor is liable upon his covenant of quiet enjoyment for any interference authorized by him by his subsequent lessees with the exclusive possession of the first lessee. Sherman v. Williams, 113 Mass. 481, 485, 18 Am. Rep. 522; Baugher v. Wilkins, 16 Md. 35, 77 Am. Dec. 279. Where a landlord makes a lease to a third party of all or a portion of the premises already by him leased to another, the acts of such third party within the terms of his lease are authorized by the landlord, and he is liable therefor. Conrad Seipp Brewing Co. v. Hart, 62 Ill. App. 212, 217.

In Duncklee v. Webber, 151 Mass. 408, 24 N. E. 1082, the Supreme Judicial Court of Massachusetts held that a lessor's covenant of quiet enjoyment was implied by law from an informal lease containing the names of the parties and reading:

"I have leased to * * * for the term of three years, paying therefor 800 per annum, the rent to be payable monthly, on the 1st of each month."

In Sherman v. Williams, 113 Mass. 481–485, 18 Am. Rep. 522, the defendants leased for 7 years and 6 months a certain brick building in Boston. At the time of the lease and thereafter the defendants named owned a strip of land, not under the building, but parallel with the side of the building, 10 inches wide and 27 feet and 6 inches long. The coving and eaves of the building extended out beyond the building 10 inches and over a part of the strip a part of the way. The lessors, after making the lease, gave to the owners of the land adjoining the strip permission to construct a party wall thereon, and they built such a wall, a part of which was upon the strip and under the eaves

of the leased building. The court held that the lease of the building was the lease of the land under the eaves; that the acts of the adjoining owners in building a wall were the acts of the lessors, because they were done by their permission; that these acts deprived the plaintiffs of the exclusive possession of so much of the leased premises as the wall covered, and constituted a breach of the lessors' covenant of quiet enjoyment.

In Case v. Minot, 158 Mass. 577, 585, 587, 33 N. E. 700, 22 L. R. A. 536, the defendants leased to the plaintiffs for years the second, third, fourth, and fifth stories of the east half of their building. Subsequently they leased the entire building to one Jordan and another, subject to the lease to the plaintiffs, and subject to one or two other leases of parts of the building. In this second lease they authorized Jordan to put in an electric apparatus and to build a chimney on the east side of the building upon land owned by the defendants which was not covered by the building. Jordan constructed the chimney, and when completed it obstructed somewhat the light and air in front of some of the windows in that part of the building leased to the plaintiffs. The lease contained no covenants. The Supreme Judicial Court of Massachusetts held that the defendants were liable for any interference or disturbance by their subsequent tenants of the plaintiffs' exclusive possession of the premises leased to them and of the light and air appurtenant thereto, and that the erection of the chimney by the subsequent lessees with the permission of the lessors constituted a breach of their implied covenant of quiet possession.

Where a tenant for years, after subletting to a third party and before the underlease has expired, surrenders to the landlord, the latter is guilty of a trespass in entering upon the sublessee. Krider v. Ramsay, 79 N. C. 354. A removal by the lessor of fences enclosing the leased premises is a material disturbance of the rights of the lessee for which the lessor is liable in damages. Abrams v. Watson, 59 Ala. 524, and State v. Piper, 89 N. C. 551. In Levitzky v. Canning, 33 Cal. 299, 306, 308, the defendant leased his building to the plaintiff for years. During the term he gave leave to a washerwoman without charge to use the roof of the building to hang clothes out to dry, and she did so. The court held that this was beyond all question a breach of the lessor's covenant of quiet enjoyment for which he was liable.

If a lessor may not lawfully disturb the possession of his lessee for years of a building by permitting an adjoining owner to put a party wall on part of a 10-inch strip and in part under the eaves of the building, or disturb the possession of the lessee for years of the second, third, fourth, and fifth stories of a building by permitting the subsequent lessee of the entire building to erect a chimney obstructing in some degree the light to the windows leased to the first lessee, although on land not beneath the stories covered by that lease, or disturb the possession of his lessee by removing a fence upon the leased premises, or disturb the possession of his lessee of a building by subsequently permitting a washerwoman to dry her clothes on the roof of it, is it not reasonably clear that neither a lessor nor his subsequent lessee may lawfully disturb the possession of his prior lessee for years of an en-

tire tract of land by leasing or entering upon a half acre, or any other part of the land, much less all of the surface of the tract which is or may become reasonably necessary to enable the subsequent lessee to prospect for, mine, store, and remove the gas within it? Other illustrations of the application of the general rules of law which have been recited may be found in the authorities to which reference has been made above, but which have not been here reviewed at length. An examination of these and other decisions has convinced that the following propositions of law are founded in reason and are established without dissent by the authorities:

A lessee for years of a tract of land from the owner, without reservation, restriction, or exception, has the absolute right to the exclusive possession of every part of the surface and of every part of the land from the zenith to the nadir during the term of the lease. A stranger has no right to enter upon or in any way disturb the possession of such a lessee without his consent, and if he does so the lessee may maintain a suit, against him for appropriate relief. Neither the lessor nor any one by his subsequent authority, grant, or lease, has any such right: (1) Because by the lessor's lease of the entire premises without exception or reservation he divests himself of all right to enter upon or to interfere in any way with the exclusive possession by the first lessee of every part of the surface of, and of every part of the entire, premises leased; and (2) because the law implies from his use of the word "let," or the word "lease," or any similar word in his lease, his covenant with the lessee that the latter shall enjoy the quiet possession of the entire premises leased, free from any interference with or disturbance of his exclusive possession of every part thereof, either by the lessor or by any one claiming under him, and all subsequent lessees take subject to this covenant which runs with the land. So it is that a lessor and those claiming under him have much less appearance of right to enter upon and occupy any part of the leased premises, or to interfere with or disturb the exclusive possession of the first lessee, than an entire stranger, for they have no better right than such stranger, and he is not bound by any covenant of quiet enjoyment or subject thereto. And because the lessee in the case at bar first leased for years the entire tract of land here in question and every part of it, and the lessee took possession of it under the lease before the lessor made the subsequent lease to the Midland Oil Company of the right to take and occupy the land for the purpose of prospecting for and removing oil and gas therefrom, my mind finds no way of escape which is to it either logical or reasonable from the conclusion that neither the lessor nor the subsequent lessee has any right whatever to enter upon or to occupy any part of the surface of the land first leased to Kemmerer, or any other part of that land, or to interfere with or disturb Kemmerer's exclusive possession thereof during the term of the lease.

This conclusion has not been reached without a careful study and deliberate consideration of the argument and the authorities upon which the majority base their decision of the question under discussion; but they have not proved convincing, and they seem to me

to be inapplicable to the facts of this particular case. As I understand the argument it is substantially this: The original owner of a tract of land may subdivide it by horizontal planes and lease the stratum between two such planes to one party, and that between other planes to another, and the surface to another in the same way that the owner of a tall building may lease different stories to different tenants. The sale or leasing by such owner of coal or other mineral beneath the surface of the land is by implication a sale or lease of the right to use so much of the surface of the land as is reasonably necessary to enable the lessee to remove the coal or other mineral from the stratum beneath the surface in which it is found. Therefore the subsequent lease by the lessor in this case to the Midland Oil Company of the right to enter upon and use so much of the surface of the land here in question as should be necessary to prospect for and remove the oil and gas under it gave to the Midland Company a right to enter upon and use that surface which was superior to the right of Kemmerer to whom this lessor had previously granted for a term of years the absolute right to the exclusive possession of every part of the surface of, and of every other part of, the land.

But to my mind the conclusion is neither the logical, the natural, nor the reasonable result of the premises. Conceding that the original owner of a tall building, or of a tract of land, may subdivide it by horizontal planes, may convey, or mortgage, or lease the different stories of the building, or the different strata of the land, to different lessees, and that under such sales, or mortgages, or leases, the different lessees may have such implied rights against the owner and those subsequently claiming under him, to the use of the halls, exits, and entrances of the building, and to the use of the surface of the land as may be reasonably necessary to enable them to derive the intended benefits of their leases, it does not follow that an owner who has sold, or mortgaged, or leased for years his entire building, or his entire tract of land, to a lessee who has taken possession thereunder, can thereafter, as against such lessee, lawfully subdivide, sell, mortgage, or lease any story or any part of the building, or any stratum or any part of the land, so as to take back to himself from the first lessee and to vest in the subsequent lessee any right to enter upon, use, disturb, or interfere with the right of the first lessee to the exclusive possession of the building or land leased and every part thereof. If the owner sells and conveys a building, and the grantee takes possession thereof, the grantor cannot thereafter lawfully subdivide that building, or sell, mortgage, or lease any part of it, so as to give to the second grantee any right to any part of the property as against the first grantee. If the lessor in this case had had the power to alienate this land, and had sold and conveyed instead of letting and leasing it by the very description used in the lease to Kemmerer, he certainly could not thereafter have granted or leased any part of it, or anything in it, so as to have given his second grantee any right to the possession or use of any part of it, or of anything in it as against his first grantee. If he had mortgaged it, he could not subsequently, by leasing or selling the ore or the oil and gas in it, or the stratum in which these are or may be found, have deprived the mortgagee, or

empowered his grantee or subsequent mortgagee to deprive him, of his security, or of any part of it.

One who takes a mining lease in the face of a prior mortgage by the lessors takes subject to the rights of the mortgagee, and must account to him for the proceeds he derives from the mines. First National Bank v. G. V. B. Min. Co. (C. C.) 89 Fed. 449, 451. ,And by the same mark this lessor, by his lease to Kemmerer for years of the entire tract without restriction, exception, or reservation, granted to him the absolute right to the exclusive possession of every part of the surface and of every other part of the land during the term of the lease, and divested himself of all power and right as against Kemmerer to enter himself upon or to interfere with Kemmerer's exclusive possession of every part of the surface and of every other part of the land, and of all power and right by attempted subdivision, lease, grant, or permit subsequently to authorize the Midland Oil Company, or any other party, so to do during the term of Kemmerer's lease.

It is not claimed that any authority has been discovered which directly decides to the contrary, or which holds that the crucial question, May the owner of a tract of land, who has leased it for years without any restriction, or reservation, or exception, to a lessee who has taken possession of it under the lease, vest in a second lessee by a subsequent lease the right to take oil and gas from that land, or by any other subsequent grant, or lease, the right to deprive the first lessee of his right to the exclusive possession of every part of the surface of the tract during the term of his prior lease, should be answered in the affirmative. But Rend v. Venture Oil Co. (C. C.) 48 Fed. 248, Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 Atl. 597, 18 L. R. A. 702, 34 Am. St. Rep. 645, Mansfield Coal & Coke Co. v. Mellon, 152 Pa. 286, 25 Atl. 601, and Telford v. Jenning Producing Co., 121 C. C. A. 516, 203 Fed. 456, are cited as cases tending toward support to such an answer. Bearing in mind that the facts in this case are a first lease for years of the entire tract of land, and every part of it, and possession of the lessee thereunder, against a lease thereafter made by the same lessor of the right to prospect for and take oil and gas from the land, and to enter upon, occupy, and use so much of the surface as should be necessary for that purpose against the prior right of the first lessee to the exclusive possession of every part of the land, let us apply to the opinions in these cases the familiar rules announced by Chief Justice Marshall that "an opinion in a particular case, founded on its special circumstances, is not applicable to cases under circumstances essentially different" (Brooks v. Marbury, 24 U. S. [11 Wheat.] 78, 90, 6 L. Ed. 423); and "general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used; if they go beyond the case, they may be respected but ought not to control the judgment in a subsequent suit, when the very point is presented for decision" (Cohens v. Virginia, 19 U. S. [6 Wheat.] 264, 398, 399, 5 L. Ed. 257);—and see how far they indicate that the question at issue should be answered in the affirmative.

In Rend v. Venture Oil Company, which was decided in 1891, the owner of the land had first granted to Rend, the plaintiff, all the coal in the land and a perpetual right to use the underground entries to

remove the coal mined therein, or any other coal for which the entries were convenient. Subsequently the owner, still owning the surface of the land and in its possession, granted to the Venture Oil Company permission to enter upon that surface and drill for oil and gas, and the company had done so and threatened to extend its well through the space where the coal had been into the land beneath. Rend had removed all the coal from this space years before, except some pillars left to support the surface, and had ceased active operations at that place. He asked the court to enjoin the Venture Company until the hearing from sinking its well through the space where the removed coal had been, and his request was denied by the court, because Rend failed to show a clear legal or equitable right to the exclusive possession of this vacant space, and because he failed to show that any substantial injury was likely to be inflicted upon him or upon his property before the final hearing of the case by permitting the casing of the well to pass through the space from which the coal had been removed.

Two years later the cases of Chartiers Block Coal Co. v. Mellon, 152 Pa. 286, 25 Atl. 597, 599, 18 L. R. A. 702, 34 Am. St. Rep. 645, and Mansfield Coal & Coke Co. v. Mellon, 152 Pa. 286, 25 Atl. 601, were decided by the Supreme Court of Pennsylvania. The latter case was not essentially different from the former, and no opinion was delivered in it. In the former the Block Coal Company, the plaintiff, had purchased in 1881 of the owner of the land all the coal under it and the right to enter upon the surface of the land, to take into and place thereon any material it might desire to use in its mining operations, and the right to make and use entries to take and carry away the coal. In 1891 the owner of the land made leases thereof for oil and gas purposes, and one of the lessees was drilling and threatening to drill wells through the spaces where the coal had been, and in some places through some of the veins of coal still remaining in the land, in order to reach the oil and gas below. The Block Company sought an injunction. The trial court granted a preliminary injunction against the drilling of some of the wells, and refused to grant it against the drilling of others, and his decision was affirmed above by a divided court. The two judges who delivered opinions held that, as the owner of the land before he made any sale or lease of any of it, or of any minerals in it, owned it from the zenith to the nadir, and had the right of access to every part of it, he did not part with his right of access to the part beneath the coal by a sale of the coal in the land, and that by a subsequent lease he might grant this right of access to a lessee. Chief Justice Paxson placed this right of access through the coal sold on the ground that a sale or lease of the coal did not convey the space in which it was found, but left that and a right of way through it in the owner of the land. He said:

"Prior to the sale of the coal his estate, as already observed, reached from the heavens to the center of the earth. With the exception of the coal, his estate is still bounded by those limits. * * * The grantee of the coal owns the coal, but nothing else, save the right of access to it, and the right to take it away. Practically considered, the grant of the coal is the grant of the right to remove it. * * * It cannot be seriously contended that, after

the coal is removed, the owner of the surface may not utilize the space it had occupied for his own purposes, either for shafts or wells, or to reach the underlying strata. The most that can be claimed is that, pending the removal, his right of access to the lower strata is suspended. The position that the owner of the coal is also the owner of the hole from which it has been removed, and may forever prevent the surface owner from reaching the underlying strata, has no authority in reason, nor do I think in law. The right may be suspended during the operation of the removal of the coal to the extent of preventing any wanton interference with the coal mining, but for every necessary interference with it the surface owner must respond in damages. The owner of the coal must so enjoy his own rights as not to interfere with the lawful exercise of the rights of others who may own the estate above and below him. The right of the surface owner to reach his estate below the coal exists at all times. The exercise of it may be more difficult at some times than at others, and attended with both trouble and expense. No one will deny the title of the surface owner to all that lies beneath the strata which he has sold. It is as much a part of his estate as the surface. If he is denied the means of access to it, he is literally deprived of an estate which he has never parted with."

In Telford v. Jenning Producing Company the plaintiffs agreed to procure and deliver to the defendant for $75 per acre an oil and gas lease of 262½ acres of land, "together with good and sufficient title." They procured such a lease from the owners of the land, but former owners had previously sold and conveyed the coal under 50 acres of the land to a third party, and the defendant refused to take and pay for the oil and gas lease on the ground that on account of the previous sale of the coal the title was not good and sufficient. The court, citing and quoting from Chartiers Block Coal Co. v. Mellon, held that the defendant was in no sense prejudiced by the sale of the coal, and that the lease tendered offered him good title to the oil and gas and to the right of access to it through the space occupied by the coal.

It seems clear that there is nothing in these decisions or in the opinions in them in any way tending to overthrow the long and firmly established principles sustained and illustrated by the decisions and text-books to which reference has been made, to the effect that neither a lessor nor his subsequent lessee can lawfully interfere with and disturb the exclusive possession of a prior lessee for years, without restriction, reservation, or exception, of an entire tract of land. They go no farther than to sustain the familiar principle that the sale and conveyance by the owner of a tract of land, while he still owns it and still has the right to the exclusive possession and use of the surface of it, of the coal in it or of the oil and gas in it, carries to the respective lessees, by implication, the right, as against the lessor and against each other, to such entry upon and use of the surface, and of the spaces containing the coal and the oil and gas, as shall be reasonably necessary to enable each of them to have access to and to remove the mineral granted to them. They do not hold that after an owner has sold and conveyed or mortgaged, or leased for years, a tract of land without restriction to any specific purpose, and without any reservation, he or his subsequent lessees or grantees for mining purposes, or for any other purpose, may lawfully assail the title or disturb the possession of the prior grantee, mortgagee, or lessee. They

in no way challenge or deny these indisputable propositions: While one is the owner of a tract of land, he may separate it into different strata, and grant the right to one stratum to one party, and the right to another stratum to another party; but when he has parted with all his right and title to all of his tract he can no longer subdivide it, or grant any right in it. While one is the owner of the exclusive right to the possession of a tract of land, or even of the surface of it, he may grant by express lease, or by implication by means of mining leases, rights to the possession and use of parts of the surface of his tract. But the whole of the surface is greater than any of its parts and contains all of them, and after he has granted and covenanted to one by a lease for years the exclusive possession of the entire surface of a tract of land, or the exclusive possession of the entire tract, he cannot lawfully grant to another by express leases, or by implication by means of mining leases, or in any other way, any right to the possession of any part of the surface of that tract during the term of the lease.

As careful a search of the authorities as I have been able to make has disclosed no decision or opinion which seems to me to contradict or to challenge this proposition, or to support an affirmative answer to the question at issue, and I am unable to bring my mind to consent to such an answer. The more the question has been studied the stronger has become my conviction that reason and indisputable authority sustain the position that the owner of a tract of land, who has leased it for years without any restriction, reservation, or exception to a lessee who has taken possession of it under the lease, cannot vest in a second lessee by a subsequent lease of the right to take oil and gas from that land, or by any other subsequent grant or lease the right to deprive the first lessee of his right to the exclusive possession of every part of the surface of the land and of every part of the land itself during the term of his lease. In my opinion this case is governed by this proposition. Kemmerer has the absolute right to the exclusive and undisputed possession of every inch of the surface of this land, and neither Woodard nor the Midland Oil & Drilling Company have the shadow of any right to enter upon or occupy any part of it, or to disturb in any way his exclusive possession of every part of it during the term of his lease.

It is true that the leases which have been considered were made under the act of May 27, 1908 (35 Stat. 312), which provides, among other things:

"That leases of restricted lands for oil, gas or other mining purposes, leases of restricted homesteads for more than one year, and leases of restricted lands for periods of more than five years, may be made, with the approval of the Secretary of the Interior, under rules and regulations provided by the Secretary of the Interior, and not otherwise."

But this provision merely grants owners of restricted lands rights to lease which owners of unrestricted lands have without such a grant. It does not forbid, but authorizes, owners of restricted lands to lease them for years without restriction, exception, or reservation, and when so leased it leaves the lessors and lessees subject to the general rules of law applicable to the rights of lessors and lessees of unre-

stricted lands. It does not command or require owners of restricted lands to make separate leases of them for oil and gas, or for coal, or for grazing, or for agricultural purposes, to different lessees, but gives them power to lease them for years for all purposes, without reservation or exception, and it nowhere enacts that as to such leases the familiar and established principles of law shall be repealed or reversed, or that the rights of subsequent lessees from the owners of restricted lands shall be superior to the rights of prior lessees granted by the same lessors. The provision, therefore, does not, in my opinion, modify, repeal, or reverse, as to the leases and the rights of the parties in this case, the general principles and rules of law to which reference has been made, but leaves them subject thereto, and the lessor and the Midland Oil & Drilling Company without any right whatever to enter upon or occupy any part of the surface of the land leased to Kemmerer, or to disturb in any way his exclusive possession of every part of it during the term of his lease.

The result is that the defendant, the Midland Oil & Drilling Company, was continually and repeatedly, day after day, trespassing upon the estate for years of the plaintiff, disturbing and depriving him of the exclusive possession of the surface of the land leased to him, to which he was lawfully entitled, and upon these facts he prayed for an interlocutory injunction. It is said that he was not entitled to it, because measured by the rent to be paid by the plaintiff the use of the half acre upon which the defendant was repeatedly trespassing was worth only $1.25, and much money would be lost by the trespasser by reason of the abstraction of the oil and gas it was seeking by others if it were not permitted to continue its trespasses, and in the second place that the court below denied the injunction, and where the trial court "has not departed from the rules and principles of equity established for its guidance its orders in this respect may not be reversed by the appellate court without clear proof that it has abused its discretion," and that where there has been no such departure it is the discretion of the trial court, and not that of the appellate court, that is to determine whether or not such an injunction should issue.

But in my opinion the court below, by its refusal of the injunction, did depart from the rules and principles of equity established for its guidance; those rules and principles left no discretion for that court or this court to exercise, and for that reason its order should be reviewed and reversed. It is one of the established rules and principles of equity jurisprudence that it is the duty of a court of chancery to protect one clearly entitled to the exclusive possession of real estate from repeated or continuing trespasses upon it by its injunction, whenever the resulting damages from those trespasses are so small and so frequent, or so continuous, that actions at law for them would cost more than they would produce, and would not be likely to stop the disturbance of his possession, or prevent the continuance of the trespasses, and thus would afford no adequate remedy at-law. U. S. Freehold Land & Emigration Co. v. Gallegos, 89 Fed. 769, 773, 32 C. C. A. 470; Lembeck v. Nye, 47 Ohio St. 336, 353–5, 24 N.

E. 686, 691, 8 L. R. A. 578, 21 Am. St. Rep. 828; Richards, v. Dower, 64 Cal. 62, 64, 28 Pac. 113; Clowes v. Staffordshire Potteries Waterworks Co., L. R. 8 Chan. App. 125, 142; The Attorney General v. Sheffield Gas Consumers' Co., 19 English Law and Equity Reports, 639, 648; Goodson v. Richardson, L. R. 9 Chan. App. 221, 224; Wilts & Berks Canal Navigation Co. v. Swindon Waterworks Co., L. R. 9 Chan. App. 451; Galway v. Metropolitan Elevated Ry. Co., 128 N. Y. 132, 145, 147, 28 N. E. 479, 13 L. R. A. 788; Dimick v. Shaw, 94 Fed. 266, 268; 2 Wood on Nuisances, § 778, note pages 1126, 1127; 2 Beach on Injunctions, §§ 1129, 1146; Evans v. Ross, 8 Pac. 88; [1] Tallman v. Metropolitan Elevated R. R. Co., 121 N. Y. 119, 123, 124, 23 N. E. 1134, 8 L. R. A. 173; Uline v. N. Y. C., etc., R. R. Co., 101 N. Y. 98, 122, 4 N. E. 536, 54 Am. Rep. 661; Poirier v. Fetter, 20 Kan. 47; Johnson v. City of Rochester, 13 Hun (N. Y.) 285.

One who has the right to the exclusive possession of real estate also has the right to the prevention by an adequate remedy of the infringement or disturbance of that right. The duty of a court of equity by its injunction to protect such a right to possession is not conditioned by the value of the right, or by the amount of the damage from its infringement, but by the absence of an adequate remedy at law to protect that right and to prevent the infringement. The owner of the right to the exclusive possession of a farm or of a lot in a city, of little value, which is repeatedly or continuously infringed by such trespasses as the wrongful turning of a horse or hog into his field or pasture, the daily picking of flowers which he cultivates, not for profit, but for his pleasure, upon his lot, the oft-repeated or continuous trampling of his grass on his lot, and the repeated or continuous breaking or hacking of his shade trees, is as much entitled to the injunction of a court of chancery to protect his right to the exclusive possession of his property and to prevent its disturbance by such trespasses, although his pecuniary damage therefrom is so small as to be almost negligible, as is the owner of property of great value from trespasses causing damages so great that the wrongdoer can never repay them; and this for the reason that actions at law for such trespasses would be more expensive than compensatory, and as the amounts which could be received would be so small as to be negligible they would not be likely to deter the trespasser from continuing his disturbance of the possession of the owner. Nor is it any defense to the prayer of one, whose right to the exclusive possession of real estate is being wrongfully infringed by continuing and vexatious trespasses, for the injunction of a court of chancery to stop them and to prevent their repetition, that the trespasser is deriving, or probably will derive, thousands of dollars of profits from his wrongdoing, and it will inflict a damage of only a few cents upon the injured man. The power and duty of a court of equity to protect the owner of the right to the exclusive possession of real estate from continuing trespasses, against which he has no adequate remedy at law, is not measured by the

---

[1] Reported in full in the Pacific Reporter; reported as a memorandum decision without opinion in 67 Cal. xix.

value of the right, by the amount of damage to it by the trespasses, or by the great profit which the wrongdoer is obtaining by continuing them. It has long been a rule of action in this court that:

"A continuing trespass upon real estate, or upon an interest therein, to the serious damage of the complainant, warrants an injunction to restrain it. A suit in equity is generally the only adequate remedy for trespasses continually repeated, because constantly recurring actions for damages would be more vexatious and expensive than effective." U. S. Freehold Land & Emigration Co. v. Gallegos, 89 Fed. 769, 773, 32 C. C. A. 470.

It is often said that irreparable damage is a condition of the issuance of an injunction. But within the meaning of that saying damage caused by continuing trespasses upon the right to the exclusive possession of real estate so small as to be negligible, or so small that its recovery by actions at law would cost more than they would produce, while they would not be likely to prevent the continuing trespasses, is irreparable damage, because it is damage that cannot be repaired by actions at law. Wood, in the second volume of his work on Nuisances (3d Edition, at section 778), well states this rule in these words:

"By irreparable injury is not meant such injury as is beyond the possibility of repair, or beyond possible compensation in damages, nor necessarily great injury, or great damage, but that species of injury, whether great or small, that ought not to be submitted to on the one hand, or inflicted on the other, and which, because it is so large on the one hand, or so small on the other, is of such constant and frequent recurrence that no fair or reasonable redress can be had therefor in a court of law."

And the reason for this rule is nowhere better stated than by Lord Justice Mellish in his opinion in Clowes v. Staffordshire Potteries Company, L. R. 8 Chan. App. 125, 142. In that case an injunction was sought against the maintenance of an expensive reservoir which had already been built, for the reason that its maintenance caused water used by the plaintiff's tenants to be muddy. The defendant had offered the tenants a filter, and the evidence was that the use of such a filter would remedy the muddy condition of the water. But the tenants had declined to accept the offer, and the Vice Chancellor had denied the injunction with the remark:

"If you can recover at law at all, I think you will get no greater damages than would be sufficient to pay for a filter, and that would be a sufficient compensation."

Lord Mellish, in reversing the order of the court below, said in his opinion:

"But, with submission to the Vice Chancellor, I do not think the plaintiff would get at law a sum sufficient to put up a filter. She would only get, in the first instance, nominal damages, because in a case of this kind she cannot prove specific damage, and there is no evidence here of specific damage, and upon that evidence she would only get 40s. damages. Then you must bring a second action, and what you would get in the second action would be the actual damage which you had proved you sustained between the bringing of the first action and the second. Then you would bring a third action, with the same result. It is because it is most inconvenient to leave the rights of parties to be determined in that way, and in fact because it is impossible to leave it in that way, that this court has always in such cases given relief."

The writer of note 4, page 1127, 2 Wood on Nuisances, after quoting these remarks, adds:

"The learned Lord Justice in this case gave expression to the true rule controlling this class of cases. The very fact that a right has been violated, and that this violation is constantly going on, and that a court of law cannot in damages compensate the injury or stop the wrong, furnishes the best possible reason for the interference of a court of equity, and the fact that the actual injury resulting from the violation of the right is small, and the interest to be affected by the injunction is large, is not to weigh against the interposition of preventive power, when on the one hand a right is violated, and on the other a wrong is committed. It will not do to lose sight of small rights. If their violation is tolerated, gradually the violation of larger rights will find an equal toleration, and the wildest chaos and confusion will ensue. The majesty and dignity of the law is best preserved when the scales of justice are balanced evenly, and its powers asserted to uphold even the smallest interests, against aggression from others. Vice Chancellor Bruce, in Attorney General v. Sheffield Gas Co., 19 Eng. Law & Eq. 648, gave utterance to a rule which, although not adopted in that case, has since become the rule which governs the English courts in all such cases. 'It seems to me,' said he, 'that even slight infringements of rights respecting real estate * * * require to be watched with a careful eye and repressed with a strict hand by a court of equity where it can exercise jurisdiction.' * * * See also a strong case in support of the doctrine of the text, Goodson v. Richardson, L. R. 9 Chan. App. 224, where it was held that the mere invasion of a right without actual damage, which was continuous in its nature, entitles a party to an injunction. In a recent English case, Wilts, etc., v. Swindon Waterworks Co., L. R. 9 Chan. App. 451, the right of a party to an injunction to restrain the violation of a right, where no actual damage was shown, was raised and decided."

In that note many authorities are cited in support of the text and of the note.

In my opinion the foregoing rules and principles apply to this case. The plaintiff has the clear and undoubted right to the exclusive possession of every inch of the surface of the land which is the subject of this controversy. The defendant, without right or lawful authority, is committing repeated and continuing trespasses upon it, which interfere with and disturb that possession. The plaintiff has the right to the complete protection of his right to the exclusive possession of every inch of the surface of this land by an adequate remedy. The pecuniary damage inflicted by the trespasses is so small and so continuous that actions at law to recover damages would cost more than they would produce, and they would not be likely to stop or prevent the continuing wrong. In other words, such actions would not only fail to furnish an adequate remedy for the trespasses, but they would bring upon the plaintiff additional cost and damage in excess of all he could possibly recover. As the plaintiff has a clear right to the stoppage and to the prevention of the continuing trespasses, and is without remedy at law, it is within the power, and is the duty, of a court of equity to stop and prevent these wrongs by its injunction.

For these reasons, the order denying the injunction should, in my opinion, be reversed, and the court below should be directed forthwith to issue the injunction sought.